2015 CO 9

**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Ramiro MUNOZ–GUTIERREZ, Defendant–Appellee.**

**Supreme Court Case No. 14SA187**

Supreme Court of Colorado.

February 9, 2015

Attorneys for Plaintiff–Appellant: Pete Hautzinger, District Attorney, Twenty–First Judicial District, David M. Waite, Deputy District Attorney, Grand Junction, Colorado.

Attorneys for Defendant–Appellee: Douglas K. Wilson, Public Defender, Kara L. Smith, Deputy Public Defender, Grand Junction, Colorado.

JUSTICE BOATRIGHT delivered the Opinion of the Court.

¶ 1 In this interlocutory appeal pursuant to C.A.R. 4.1, the People seek review of the trial court's order suppressing marijuana that the police discovered in a car registered to and driven by the Defendant–Appellee, Ramiro Munoz–Gutierrez. The trial court found that the People did not establish that Munoz–Gutierrez voluntarily consented to the search of his car. We determine that the trial court applied the wrong standard and hold that Munoz–Gutierrez voluntarily consented to the search when he gave oral consent. Under the totality of the circumstances, the police's conduct did not overbear Munoz–Gutierrez's exercise of free will. More specifically, it was not sufficiently coercive or deceptive to a person with his characteristics in his circumstances. Accordingly, we reverse the trial court's suppression order and remand to that court for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶ 2 On October 19, 2013, Munoz–Gutierrez, a fifty-five-year-old man who first arrived in the United States in 1979, was driving his car to Chicago from Pixley, California. He was on Interstate 70 near Grand Junction, Colorado when Trooper Romine of the Colorado State Patrol spotted his car. Trooper Romine, a veteran trooper of approximately thirteen years and a member of a unit called the Smuggling Traffic Interdiction Section, was working the Mesa County area that day. In that capacity, he twice observed Munoz–Gutierrez's vehicle swerve over the white fog line on the right side of the highway. Based on these observations, Trooper Romine pulled over Munoz–Gutierrez.

¶ 3 When Trooper Romine approached, he saw and smelled an air freshener in the vehicle. After Munoz–Gutierrez rolled down his window, Trooper Romine noticed that the odor of air freshener had become "overwhelming." Trooper Romine then asked Munoz–Gutierrez in English for his driver's license, registration, and proof of insurance. While Munoz–Gutierrez retrieved his license, Trooper Romine observed that Munoz–Gutierrez's hands were shaking, his cheek was twitching, and he had a large amount of cash in his wallet.

¶ 4 After receiving Munoz–Gutierrez's driver's license, registration, and proof of insurance, Trooper Romine talked to Munoz–Gutierrez. Munoz–Gutierrez speaks Spanish and only a little English. Trooper Romine knows only a little Spanish. Despite the language barrier, Trooper Romine communicated with Munoz–Gutierrez in a combination of English and Spanish about Munoz–Gutierrez's background and purpose in driving through Colorado. Trooper Romine then returned to his patrol car to fill out a written warning for the traffic law violation, run Munoz–Gutierrez's name to check for outstanding warrants, and call for back-up to help him investigate the "suspicious activity." He asked for a drug canine to support him in the investigation of the suspicious activity and a trooper with Spanish-language skills to

assist in translating. Shortly thereafter, four other troopers arrived with the dog. Only Trooper Romine and Trooper Biesemeier, who offered to assist Trooper Romine by translating, had any contact with Munoz–Gutierrez regarding the consent to search. The other officers stayed near Trooper Romine's car.

¶ 5 While not fluent in Spanish, Trooper Biesemeier is familiar with the language. Before he became a trooper in 2006, he traveled to Mexico to study at the Universidad Internacional. The two-month immersion program consisted of Spanish training five days a week. Trooper Biesemeier uses Spanish at work, although he has not taken any courses since he became a trooper. When speaking in Spanish, he asks others to slow down and uses simple words to enhance communication.

¶ 6 After Trooper Romine advised Trooper Biesemeier of the situation, they went to talk to Munoz–Gutierrez. When Troopers Romine and Biesemeier reached Munoz–Gutierrez's vehicle, Trooper Romine followed his usual routine. For safety reasons, he asked Munoz–Gutierrez to get out of his car. Munoz–Gutierrez complied. Trooper Romine then explained the written traffic warning in English while Trooper Biesemeier translated. Trooper Biesemeier noticed that Munoz–Gutierrez seemed relieved when he realized he was receiving only a warning. Munoz–Gutierrez also told Trooper Biesemeier in Spanish that he had committed the violation because he was tired. Trooper Biesemeier understood that Munoz–Gutierrez said he was fatigued and suggested that he seek a local hotel. After this discussion, the troopers told Munoz–Gutierrez that he was free to leave. Munoz–Gutierrez shook hands with the troopers and started walking to his vehicle. Munoz–Gutierrez testified at the suppression hearing that he understood this conversation, and the trial court found that "there was an ability to communicate between Trooper Biesemeier and Mr. Munoz–Gutierrez."

¶ 7 After they separated and Munoz–Gutierrez began to walk back to his vehicle, Trooper Romine reinitiated contact and asked Munoz–Gutierrez in English if he could ask him a few more questions. Munoz–Gutierrez agreed. Trooper Romine asked him in English if there was something illegal in his vehicle, to which Munoz–Gutierrez replied, "No." Trooper Romine then asked, "[M]ay we search your vehicle?" Munoz–Gutierrez paused and looked at Trooper Biesemeier, and Trooper Biesemeier translated the question into Spanish. Trooper Biesemeier testified that Munoz–Gutierrez demonstrated verbally and with his body language" that the officers could search his car.

¶ 8 The troopers then gave Munoz–Gutierrez a consent to search form, written in Spanish, for him to read and sign. Trooper Biesemeier testified that they would not have given him the consent form if Munoz–Gutierrez had declined because "it would have been pointless to go forth" without the oral consent. As the troopers handed him the consent form, Trooper Biesemeier asked Munoz–Gutierrez if he could read Spanish. Munoz–Gutierrez responded that he could read a little Spanish. He then took more time than the average person to read the form, and as he read, he mouthed the words and followed along with his finger.

¶ 9 After "reviewing" the form, Munoz–Gutierrez looked at the troopers. The troopers thought Munoz–Gutierrez was asking where to sign, and Trooper Biesemeier pointed at the place to sign on the form. Munoz–Gutierrez then signed on the wrong line—the blank for the date rather than the signature line.

¶ 10 Once Munoz–Gutierrez had signed the written consent form, Trooper Romine patted Munoz–Gutierrez down, and Trooper Biesemeier searched the vehicle where they found three large bags in the trunk. The troopers opened the bags and found roughly ninety pounds of marijuana. The troopers then arrested Munoz–Gutierrez.

¶ 11 The People charged Munoz–Gutierrez with one count of Possession with the Intent to Manufacture or Distribute Marijuana or Marijuana Concentrate, and one count of Conspiracy–Marijuana and Marijuana Concentrate. Munoz–Gutierrez pled not guilty. He moved to suppress the seized marijuana

and argued that he did not voluntarily consent to the search of his vehicle.

¶ 12 At the suppression hearing, Munoz–Gutierrez testified in Spanish that the consent form confused him due to his limited education, which consisted of only four months of school in Mexico. He testified that he understood the form discussed: (1) the troopers had the right to search the vehicle and remove things from it, and (2) he had the right to refuse the search of his vehicle. He maintained he did not understand what he was supposed to do next because he believed the options were questions rather than statements. He thought that he had to choose between options (1) and (2). Munoz–Gutierrez also testified that even though he was wearing glasses, he could not see the consent form well because he did not have on his glasses "that are stronger."

¶ 13 At the conclusion of the hearing, the trial court ruled that both the oral and written consent were invalid and suppressed the marijuana discovered in the trunk. Specifically, the trial court found that the oral consent was invalid because the troopers did not tell Munoz–Gutierrez the two enumerated factors in section 16–3–310, C.R.S. (2014): (1) that the person is being asked to voluntarily consent to a search, and (2) that the person has the right to refuse that request. The trial court also found that the written consent was invalid because Munoz–Gutierrez did not understand what he was signing when he signed the written consent form. In response, the People filed this interlocutory appeal.[1]

## II. Standard of Review

 ¶ 14 A trial court's suppression order presents a mixed question of law and fact. *See People v. McIntyre*, 2014 CO 39, ¶ 13, 325 P.3d 583. We defer to the trial court's factual findings that are supported by competent evidence but review the legal effect of those facts de novo. *Id.* In our de novo review, the trial court's legal conclusions are subject to correction if it applied an erroneous legal standard to the facts of the case. *People v. Syrie*, 101 P.3d 219, 222 (Colo. 2004). Therefore, we may reverse a suppression order if the trial court applied an erroneous legal standard in deciding the voluntariness of a consent to search and there is no evidence that police conduct overbore the defendant's will. *People v. Licea*, 918 P.2d 1109, 1113 (Colo. 1996); *People v. Helm*, 633 P.2d 1071, 1077 (Colo. 1981). In addition, a statute's proper construction is a question of law that we review de novo. *Francen v. Colo. Dep't of Revenue*, 2014 CO 54, ¶ 8, 328 P.3d 111. In construing a statute, we "read the language of a statute in context and give it the commonly accepted and understood meaning." *Id.*

## III. Analysis

¶ 15 The issue is whether Munoz–Gutierrez voluntarily consented to the search of his car. To resolve this issue, we first examine the Fourth Amendment and the law surrounding voluntariness with respect to consensual searches. We next assess and apply the test articulated in *People v. Magallanes–Aragon*, 948 P.2d 528 (Colo. 1997). We also analyze section 16–3–310, C.R.S. (2014), and conclude that the trial court misconstrued the statute when it treated as dispositive that the troopers failed to use specific language from the statute. We then apply the law to the facts of this case and conclude that the troopers did not overbear Munoz–Gutierrez's exercise of free will, and as a result, they obtained voluntary, oral consent to search his vehicle.

## A. The Law of Voluntariness with Respect to Consensual Searches

 ¶ 16 The Fourth Amendment of the United States Constitution and Article II, Section 7 of the Colorado Constitution

1. Section 16–12–102(2), C.R.S. (2014), allows the prosecution to file an interlocutory appeal after the trial court grants a motion to suppress evidence if the prosecution "certifies to the judge who granted such motion and to the supreme court that the appeal is not taken for the purposes of delay and the evidence is a substantial part of the proof of the charge pending against the defendant." The People here filed such a certificate, and in their Notice of Interlocutory Appeal they indicated that the suppressed marijuana is the bulk of their evidence against Munoz–Gutierrez.

protect the right of the people to be free from unreasonable searches and seizures. *People v. Hopkins*, 870 P.2d 478, 480 (Colo. 1994). The right generally prohibits warrantless searches of a person's property. *Id.* Nevertheless, a warrantless search is constitutionally justified when it is conducted pursuant to voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 243, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *People v. Drake*, 785 P.2d 1257, 1265 (Colo. 1990). Consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041; *accord, e.g., Licea*, 918 P.2d at 1112.

¶ 17 Conversely, a consensual search is involuntary when police overbear the consenting party's will and critically impair the party's "capacity for self-determination." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041. Thus, a consensual search is involuntary if it is " 'the result of duress or coercion, express or implied, or any other form of undue influence exercised [by the police] against the defendant.' " *Magallanes–Aragon*, 948 P.2d at 531 (quoting *People v. Thiret*, 685 P.2d 193, 201 (Colo. 1984)). Undue influence includes promises, threats, and intrusive or threatening police conduct. *See People v. Johnson*, 865 P.2d 836, 845 (Colo. 1994). In sum, the key concern is whether the police's intrusive conduct "critically impaired the defendant's judgment." *Magallanes–Aragon*, 948 P.2d at 531 (citing *Schneckloth*, 412 U.S. at 228–29, 93 S.Ct. 2041; *Capps v. People*, 162 Colo. 323, 327, 426 P.2d 189, 191 (1967)).

## 1. The Totality of the Circumstances Analysis Determines Voluntariness.

¶ 18 The United States Supreme Court in *Schneckloth* stated that the determination of whether the police overbore a defendant's will and rendered his consent involuntary is based on the totality of the circumstances. 412 U.S. at 226, 93 S.Ct. 2041. The Supreme Court rejected the notion that voluntariness hinges on a defendant's understanding that he may refuse consent to a search. *Id.* at 234, 248–49, 93 S.Ct. 2041. Rather, the Supreme Court reasoned that, while the defendant's knowledge of a right to refuse is a factor in the determination, it is not "a prerequisite to establishing a voluntary consent." *Id.* at 249, 93 S.Ct. 2041.

¶ 19 Eight years later, we adopted the rationale from *Schneckloth* in *Helm. Helm*, 633 P.2d at 1073, 1076–77 (concerning the suppression of evidence from a roadside sobriety test and a blood alcohol test). The lower courts in that case reasoned that the defendant's consent was involuntary unless he gave consent intelligently and with information from the officer about his right to refuse. *Id.* at 1075. We reversed and, citing *Schneckloth*, stated that courts must look at the totality of the circumstances to determine voluntariness; a defendant's knowledge of the right to refuse is only a factor in that determination. *Id.* at 1076; *see also Licea*, 918 P.2d at 1111–13 (stating that voluntary consent is determined based on the totality of the circumstances, and there is a "difference between a voluntary act and an act that is done knowingly and intelligently").

¶ 20 In addition to clarifying that voluntary consent need not be given with knowledge of the right to refuse, in *Helm* we articulated important factors in the totality of the circumstances analysis, namely: the age, education, and intelligence of the defendant; the duration, location, and circumstances of the search; the consenting person's state of mind; and anything else that could have affected the defendant's free and unconstrained choice in consenting to the search. 633 P.2d at 1077; *see also People v. Carlson*, 677 P.2d 310, 318 (Colo. 1984). We also reasoned that police officers do not have an affirmative duty to warn parties of their right to refuse consent because other evidence may adequately demonstrate voluntary consent. *Helm*, 633 P.2d at 1077.

¶ 21 Later, in *People v. Castro*, 159 P.3d 597, 600 (Colo. 2007), we expressed that a language barrier between police officers and the defendant is relevant to the totality of the circumstances analysis. In *Castro*, the trial court suppressed cocaine evidence found in the defendant's car because it could not determine whether the defendant spoke sufficient English to validly consent. *Id.* at 598–99. We reversed because the evidence

showed that the defendant spoke English well enough to communicate with the officers and validly consent to the search. *Id.* at 600–01. The record demonstrated that the defendant responded appropriately to the officers' questions, and critically, the record contained no evidence of police coercion. *Id.*

## 2. *Magallanes–Aragon* Demonstrates the Correct Application of the Totality of the Circumstances Test.

¶ 22 Our determination in *Magallanes–Aragon* is particularly instructive. In that case, the trial court suppressed marijuana evidence recovered from a car based on the defendant's consent to search because the defendant "was educated in Mexico and did not believe that he had a right to refuse to consent to the search." 948 P.2d at 530, 532. Its findings showed that it focused exclusively on the defendant's "subjective characteristics and perceptions." *Id.* at 532.

¶ 23 On appeal, we concluded that the trial court applied an erroneous legal standard. *Id.* at 532–33. Like the lower courts in *Helm* and *Licea,* the trial court in *Magallanes–Aragon* incorrectly focused on the defendant's "subjective characteristics and perceptions" and "failed to adequately consider whether there was objective evidence of overbearing, intrusive, coercive or deceptive behavior by the police." *Id.* at 532. We emphasized that "there is a distinction between a voluntary act and an act done knowingly and intelligently" and that "[n]either an intelligent consent nor knowledge of the right to refuse to consent [is] essential to a voluntary consent." *Id.* (citing *Licea,* 918 P.2d at 1113; *Helm,* 633 P.2d at 1076). Rather, the court first considers evidence of police coercion and the defendant's subjective characteristics. *Id.* at 531. It then applies an objective test that takes into account the

totality of the circumstances and determines "whether the police conduct could reasonably have appeared to the defendant to be coercive." *Id.* Critical to the analysis is "the impact of overbearing, coercive, or deceptive police conduct on a person with the knowledge and particular characteristics of the defendant." *Id.* at 533. The impact of the police's conduct must not overbear the defendant's will. *Id.* at 530. We also specified that the analysis is an objective assessment of police actions, not an inquiry into the police's subjective belief in the appropriateness of their actions. *Id.* at 533.

¶ 24 Because the trial court applied an erroneous legal standard and failed to make findings surrounding the consent to search, such as resolving disputed testimony in the record, we reversed and remanded the case to the trial court.[2] *Id.* at 532–33, 534. Further, we instructed the trial court to apply the correct legal standard—whether, under the totality of the circumstances, the police's conduct overbore the defendant's exercise of free will because it was sufficiently coercive or deceptive to a person with his characteristics in his circumstances. *Id.* at 534.

## 3. Analysis of Section 16–3–310.

¶ 25 Subsequently, the General Assembly passed section 16–3–310. The trial court relied on this statute to find that Munoz–Gutierrez's oral consent was invalid. Section 16–3–310 directs a peace officer to provide an oral advisement prior to conducting a consensual search of a person's vehicle. Paragraph (b) of subsection 16–3–310(1) states two factors that the officer should articulate prior to the consensual search of a vehicle: (1) the person subject to the search is asked to give voluntary consent, and (2) the person has the right to refuse the request.[3] Furthermore, subsection (3) clarifies that "[i]f a defendant moves to suppress any

---

2. Because the trial court in this case, unlike the trial court in *Magallanes–Aragon,* found that there was no police coercion with regard to Munoz–Gutierrez's oral consent, we need not remand to the trial court to have it determine voluntariness.

3. The paragraph reads:
 A peace officer may conduct a consensual search only after articulating the following fac-

tors to, and subsequently receiving consent from, the person subject to the search or the person with the apparent or actual authority to provide permission to search the vehicle or effects. The factors are:
 (I) The person is being asked to voluntarily consent to a search; and
 (II) The person has the right to refuse the request to search.

evidence obtained in the course of the search, the court shall consider the failure to comply with the requirements of this section as a *factor* in determining the voluntariness of the consent." § 16–3–310(3) (emphasis added). A complete reading of the statute therefore demonstrates that an officer's articulation of the two enumerated factors is only part of the totality of the circumstances analysis. Hence, the failure to specifically instruct a defendant that consent must be voluntary and that he can refuse the request to search is not determinative.

## B. Application of Section 16–3–310

¶ 26 In finding that Munoz–Gutierrez did not voluntarily consent, the trial court incorrectly focused on paragraph (b) of subsection 16–3–310(1), which provides that an officer may conduct a consensual search after articulating that "[t]he person is being asked to voluntarily consent to a search" and that "[t]he person has the right to refuse the request to search." The trial court concluded that, although Munoz–Gutierrez gave oral consent, the troopers' failure to state explicitly to Munoz–Gutierrez that they were asking for voluntary consent to search his vehicle and that he had a right to refuse the request to search was fatal to a finding of voluntariness. In so doing, it interpreted the factors in paragraph (b) of subsection 16–3–310(1) to be requirements for voluntary consent, relying on language in the subsection that "[a] peace officer may conduct a consensual search only after articulating the [above] factors." The trial court did not consider the language in subsection (3), which states that those requirements are only factors in determining voluntariness. Hence, the trial court, in determining that oral consent was invalid, misconstrued the statute by incorrectly concluding that an articulation of the two factors in paragraph (b) of subsection 16–3–310(1) is necessary to a finding of valid oral consent. It did not examine, under the totality of the circumstances, whether the troopers' conduct overbore Munoz–Gutierrez's exercise of free will because it was sufficiently coercive or deceptive to a person with his characteristics in his circumstances.

¶ 27 After finding that the oral consent was invalid under section 16–3–310, the trial court examined the validity of the written consent because it reasoned that "something more was needed" for voluntary consent. The court then based its determination of whether written consent was valid on whether Munoz–Gutierrez was able to read the written form and grasp the substance of the two factors in paragraph (b) of subsection 16–3–310(1) from the written consent form. Again, the court did not adequately examine the troopers' conduct. Therefore, like the trial court in *Magallanes–Aragon*, which "focus[ed] exclusively on [the defendant's] subjective characteristics and perceptions," 948 P.2d at 532, the trial court in this case mistakenly concluded that its decision on voluntary oral and written consent "hinge[d]" on whether it could believe Munoz–Gutierrez's statements about his education, language ability, and understanding of the troopers' questions. In sum, the trial court failed to apply the totality of the circumstances analysis when it determined that the troopers failed to obtain valid oral and written consent to search.[4]

## C. Application of the Totality of the Circumstances Test

¶ 28 After reviewing the record and considering the totality of the circumstances, we conclude that Munoz–Gutierrez voluntarily consented to a search of his vehicle when he orally consented to the search. Although the troopers did not explicitly state the two factors in section 16–3–310(1)(b), the troopers' conduct did not overbear Munoz–Gutierrez's will because their conduct was not sufficiently coercive or deceptive to a person with his characteristics in his circumstances, and thus Munoz–Gutierrez's consent was voluntary. *See Helm*, 633 P.2d at 1077 (stating that it is "not necessary to impose on police officers an affirmative duty to warn persons of their right to refuse consent because other

---

4. The trial court found additional concerns with the written consent. These concerns include issues with the translation in the consent form and the fact that Munoz–Gutierrez signed on the incorrect line of the form. Because we conclude that the oral consent was voluntary, we do not address these concerns.

evidence is often adequate to demonstrate that the search was agreed to voluntarily").

¶ 29 In determining that the oral consent was voluntary, we assess the troopers' conduct in relation to Munoz–Gutierrez's characteristics and circumstances by evaluating Munoz–Gutierrez's age, education, knowledge, and perceptions in relation to the location, duration, and environment of the police interaction. *See Magallanes–Aragon,* 948 P.2d at 532; *Carlson,* 677 P.2d at 318. The purpose of the assessment is to see if the troopers' conduct overbore Munoz–Gutierrez's will. *See Magallanes–Aragon,* 948 P.2d at 530–31.

¶ 30 Trooper Romine and Munoz–Gutierrez's initial contact occurred during a routine traffic stop on the shoulder of Interstate 70. While any contact with the police can be stressful, there is no evidence that Trooper Romine exerted undue influence over Munoz–Gutierrez when he first approached Munoz–Gutierrez's vehicle. The trial court found that there was "absolutely no problem with the stop" and that Trooper Romine followed standard policy in retrieving Munoz–Gutierrez's documents and returning to his vehicle to check for outstanding warrants. The trial court noted that Munoz–Gutierrez "had been in the United States off and on for decades," and while there may have been some language barrier between Munoz–Gutierrez and Trooper Romine, the two were able to communicate that the trooper needed documents and answers to a few background questions. Munoz–Gutierrez answered Trooper Romine's questions appropriately and provided the correct documents, and the trial court found that "[t]here was obviously an ability to communicate between [Trooper] Romine and Mr. Munoz–Gutierrez even without the aid of an interpreter or a translator." Thus, Trooper Romine's initial communication with Munoz–Gutierrez was brief and routine.

¶ 31 Despite the fact that Trooper Romine had been able to communicate with Munoz–Gutierrez up to this point, he requested a Spanish-speaking trooper. Trooper Biesemeier arrived and accompanied Trooper Romine to Munoz–Gutierrez's car to issue him a warning for twice driving outside his lane.

Because Trooper Biesemeier was able to provide translations, his involvement enhanced communication. Together, Troopers Romine and Biesemeier asked Munoz–Gutierrez to exit his vehicle; this was done so that the officers could speak to Munoz–Gutierrez without risking a traffic accident or having to speak across the passenger's side of the vehicle. Trooper Biesemeier then translated Trooper Romine's words into Spanish for Munoz–Gutierrez so that he understood that he was receiving a traffic warning. Trooper Biesemeier testified that Munoz–Gutierrez was relieved after they explained that he was receiving a warning, and the trial court found that Munoz–Gutierrez was "grateful that he was only getting a warning ticket." Trooper Biesemeier also recognized that Munoz–Gutierrez said he was tired in Spanish and suggested that he get a motel room. Again, this encounter was brief, and the troopers adequately communicated to Munoz–Gutierrez that he was receiving a warning. As a result, the trial court found that there was "no coercion" during the stop when the troopers issued Munoz–Gutierrez a warning.

¶ 32 After the troopers gave Munoz–Gutierrez the warning, the troopers shook hands with Munoz–Gutierrez and told him that he was free to go. They testified that they concluded this initial contact, based on what they are trained to do, so that any subsequent encounter would be separated from the traffic stop. In so doing, Munoz–Gutierrez would not feel compelled to do anything to avoid receiving a traffic citation. Trooper Romine then inquired whether he could ask Munoz–Gutierrez more questions. Despite being told he was free to leave and knowing he would not receive a traffic ticket, Munoz–Gutierrez said he would answer additional questions. The troopers then asked whether he had anything illegal in the vehicle. Munoz–Gutierrez understood the question and responded that he did not have anything illegal in the car. The trial court found that there was no problem with the troopers' actions and that Munoz–Gutierrez "clearly complied and answered questions" after the troopers reinitiated contact. Hence, the troopers' decision to reengage

with Munoz–Gutierrez did not coerce Munoz–Gutierrez into providing consent to search.

¶ 33 After the troopers reengaged with Munoz–Gutierrez and asked him if he had anything illegal in his car, Trooper Romine asked, and Trooper Biesemeier translated, if the troopers could search his car. At the suppression hearing, the troopers testified that Munoz–Gutierrez indicated to them that they could search his vehicle, and the trial court ultimately found that the consent was invalid because the troopers did not articulate the two factors in section 16–3–310 to Munoz–Gutierrez when he provided oral consent.[5]

¶ 34 In the request for oral consent, Trooper Biesemeier's participation enhanced communication between the troopers and Munoz–Gutierrez. At the hearing, Munoz–Gutierrez testified that he understood some of what Trooper Romine communicated but understood everything Trooper Biesemeier said because Trooper Biesemeier spoke to him in Spanish. As a result, when Trooper Romine asked, and Trooper Biesemeier translated, "may we search your vehicle," the trial court found that Munoz–Gutierrez consented. There is no record that the troopers used the language barrier to coerce or attempt to trick Munoz–Gutierrez into providing consent.

¶ 35 Trooper Biesemeier spoke sufficient Spanish to communicate with Munoz–Gutierrez. As in *Castro*, a language barrier is not determinative. Trooper Biesemeier testified that he does not remember Munoz–Gutierrez ever asking him to clarify any questions, and the trial court also found that Munoz–Gutierrez responded appropriately to Trooper Romine when the trooper asked him preliminary questions in a mixture of Spanish and English. Additionally, Munoz–Gutierrez's lack of formal education does not negate his consent because the troopers did not psychologically coerce him to consent to the search of his vehicle. *Helm*, 633 P.2d at 1077 (noting that "[b]ecause the defendant does not allege that the officer subjected him to any psychological coercion, his lack of formal education does not negate his consent").

¶ 36 Even if Munoz–Gutierrez did not know he could refuse the request to search his car, this is only a factor in determining voluntariness. *Magallanes–Aragon*, 948 P.2d at 532. Instead, while the troopers did not comply with the statute,[6] they conveyed that Munoz–Gutierrez had a choice when they asked for consent in a question—"may we search your vehicle"—that required a yes or no answer. Likewise, while the troopers did not tell Munoz–Gutierrez that he had a right to refuse the request to search, the request for oral consent was immediately preceded by two other questions—whether the troopers could ask him more questions and whether he had anything illegal in his vehicle—that Munoz–Gutierrez testified he understood. As a result, the request for oral consent to search was part of a series of questions that gave Munoz–Gutierrez options. Hence, although the troopers' failure to comply with section 16–3–310(1)(b) is a factor in determining the voluntariness of the consent, the record shows no evidence of any coercion when the troopers requested permission to search Munoz–Gutierrez's car.

¶ 37 Thus, when considering the totality of the circumstances, we conclude that Munoz–Gutierrez provided voluntary oral consent to search his vehicle. Although the troopers did not explicitly comply with the factors in section 16–3–310(1)(b), other evidence, such as the fact that Munoz–Gutierrez and Troop-

5. The parties dispute whether Trooper Biesemeier accurately translated the phrase "may we search your vehicle" to Spanish. That dispute, however, is not relevant to the issue of whether Munoz–Gutierrez provided oral consent because the trial court believed the troopers when they said that they would not have given Munoz–Gutierrez the written consent form unless he had first orally consented to the search. In particular, the trial court stated: "I tend to believe the officers when they say that they would not have given him this form of consent or form concerning consent to him [ ] if he had not verbally said he would consent."

6. Section 16–3–310(2) states that substantial compliance with the factors in section 16–3–310(1)(b) is sufficient to satisfy the advisement. It reads: "A peace officer providing the advisement required pursuant to subsection (1) of this section need not provide a specific recitation of the advisement; substantial compliance with the substance of the factors is sufficient to comply with the requirement."

er Biesemeier were able to communicate in Spanish, demonstrates that the troopers' conduct did not overbear Munoz–Gutierrez's exercise of free will because the conduct was not sufficiently coercive or deceptive to a person with his characteristics in his circumstances. While the trial court found that the written consent that Munoz–Gutierrez gave was improperly obtained, we need not reach that issue because the voluntary oral consent was sufficient.[7] We conclude that Munoz–Gutierrez's oral consent was voluntary.

## IV. Conclusion

¶ 38 For the foregoing reasons, we hold that Munoz–Gutierrez voluntarily consented to the search when he gave oral consent. Under the totality of the circumstances, the police's conduct did not overbear Munoz–Gutierrez's exercise of free will. More specifically, it was not sufficiently coercive or deceptive to a person with his characteristics in his circumstances. Accordingly, we reverse the trial court's suppression order and remand to that court for further proceedings consistent with this opinion.

JUSTICE HOOD concurs in part and dissents in part, and JUSTICE HOBBS and JUSTICE MÁRQUEZ join in the concurrence in part and dissent in part.

JUSTICE HOOD, concurring in part and dissenting in part.

¶ 39 I agree with the majority's recitation of Colorado law governing consent searches. The trial court misapplied that law in finding Munoz–Gutierrez's oral consent to search invalid based on the troopers' failure to give the statutorily required advisement set forth in section 16–3–310(1), C.R.S. (2014). Section 16–3–310(3) plainly states that an officer's failure to give the statutory advisement

is simply "a factor" in determining the voluntariness of a consent search; it is not dispositive. Should these officers have given the advisement? Yes. (And the majority certainly does not suggest otherwise.) Does their omission of it alone, however, vitiate Munoz–Gutierrez's oral consent? No. This is where the trial court took the wrong turn. But having identified the proper construction of the statute, I believe we should return this case to the trial court for further findings and to weigh the evidence—evidence that it saw and heard, and that we did not—because the record and the trial court's findings are ambiguous in important respects.

¶ 40 As the majority correctly suggests, remand is required if there is any evidence that the police conduct overbore Munoz–Gutierrez's will. Maj. op. ¶ 14. Indeed, *People v. Magallenes–Aragon*, 948 P.2d 528 (Colo. 1997), which the majority finds instructive, sheds light on this point as well. There, we stated we "may decide, on appellate review, whether a consent was voluntarily given if the record clearly contains *no evidence* to support the trial court's determination." *Id.* at 533 (emphasis added); *see also People v. Castro*, 159 P.3d 597, 600 (Colo.2007) (remand unnecessary because there was "no evidence" of involuntary consent). If, however, the record does contain evidence to support the trial court's determination, "we must remand for additional findings and a re-evaluation of voluntariness in light of those findings." *Magallenes–Aragon*, 948 P.2d at 533. After all, "[i]t is the function of the trial court and not the reviewing court to weigh the evidence and determine the credibility of witnesses," and thus "we will not substitute our judgment for that of the trial court...." *People v. Mendoza–Balderama*, 981 P.2d 150, 157–58 (Colo.1999).[1]

---

7. Because there is no evidence of coercion through the point when Munoz–Gutierrez gave valid oral consent to search, and the defendant did not argue that consent was withdrawn, we do not consider the troopers' conduct in obtaining the written consent.

1. Significantly, this is not a case where we can review a video or audio tape and glean nearly as much critical information as was available to the trial judge. *See, e.g., People v. Madrid*, 179 P.3d 1010, 1014 (Colo.2008) ("[W]here the statements

sought to be suppressed are audio- and video-recorded, and there are no disputed facts outside the recording controlling the issue of suppression, we are in a similar position as the trial court to determine whether the statements should be suppressed."); *People v. Al-Yousif*, 49 P.3d 1165, 1171 (Colo.2002) (noting that the existence of a videotaped interview allowed this court to review the adequacy of the *Miranda* warning in light of a language barrier "not just from the 'cold record,' but—at least in part—in precisely the same manner as the trial court").

¶41 As the majority acknowledges, the voluntariness of consent to search is highly fact-driven. It requires the court to correlate a defendant's personal characteristics and police conduct. *See* maj. op. ¶29 ("In determining that the oral consent was voluntary, we assess the troopers' conduct in relation to Munoz–Gutierrez's characteristics and circumstances by evaluating Munoz–Gutierrez's age, education, knowledge, and perceptions in relation to the location, duration, and environment of the police interaction."). Thus, a defendant's extremely poor comprehension can heighten the significance of even relatively innocuous police conduct. *See* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(e) (5th ed. 2014) ("[T]he propriety of the investigative and interrogation techniques used must be judged in light of what the police knew or should have known about defendant's ability to comprehend the events and circumstances surrounding him or her."). In *Magallenes–Aragon,* for example, we explained that a trial court's finding that police conduct was "proper," lawful, or based upon legitimate concerns is not dispositive of whether consent was voluntary. 948 P.2d at 533. Voluntariness depends instead on whether that conduct "reasonably appear[s] to a person with the defendant's characteristics to be overbearing, coercive, or deceptive." *Id.*

¶42 So, is there *any* record evidence of police overreaching here sufficient to justify remand? The majority thinks not. I disagree. Munoz–Gutierrez had only four months of formal education in Mexico when he was seven years old. Although unemployed, he had last worked milking cows at a dairy. The trial court found that the troopers communicating with Munoz–Gutierrez knew "rudimentary Spanish"; conversely, it was unclear how much English Munoz–Gutierrez understood. Munoz–Guttierez was

tired, having driven for twenty hours before the troopers pulled him over. While two troopers interacted with him, three others were nearby with a drug-sniffing dog. At times, he seemed confused.[2] Munoz–Gutierrez testified that the troopers did not ask him orally if they could search his car, and that he did not give them oral consent to do so. He also testified that one of the troopers yelled "sign it" when he put the written consent form before him and that he signed the form because the trooper was "pressuring" him to do so. The trial court made no credibility findings about this part of the encounter, even though it chose to underscore this aspect of Munoz–Gutierrez's testimony.

¶43 Yes, the record provides evidence to support the majority's determination that Munoz–Gutierrez's consent to search was voluntary: the traffic stop was relatively uneventful; Munoz–Gutierrez clearly understood enough English to follow commands and answer basic questions; he testified that he understood Trooper Biesemeier's Spanish; he may even have understood that he could refuse the search, but still agreed to the search, at least with "body language." But, as explained above, the record contains contrary evidence as well—evidence that supports the trial court's determination that Munoz–Gutierrez's consent to search was involuntary because there was some overreaching by the police, based on the totality of the circumstances. Given this conflicting evidence—and the limited findings by the trial court regarding Munoz–Gutierrez's oral consent due to its misapplication of section 16–3–310—we should invite the trial court's re-evaluation using the correct legal standard. We should let the judicial officer who had the front-row seat for the suppression hearing give us the benefit of his direct observations of the critical witnesses.

---

In substituting its judgment for the trial court's, the majority is relying on a cold transcript. Such reliance is not always misplaced. Sometimes the written record is unequivocal. This is not one of those times.

2. For instance, Munoz–Gutierrez ultimately signed the wrong line on the consent form (the date line and not the signature line), suggesting that he did not understand the significance of his signature on the form and may even have had difficulties reading the form. Although the majority correctly points out that it does not need to assess the validity of the written consent because of its finding of oral consent, Munoz–Gutierrez's mistake is tangible evidence of his confusion, which sheds light on the totality of the circumstances.

Therefore, I concur in part and join in all aspects of the majority's opinion aside from Part III.C, from which I respectfully dissent.

I am authorized to state that JUSTICE HOBBS and JUSTICE MÁRQUEZ join in the concurrence in part and dissent in part.