23CA0766 Peo v Plascencia 12-31-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0766
Weld County District Court No. 17CR1150
Honorable Allison J. Esser, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Damaige Dominic Plascencia,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE LIPINSKY
Dunn and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 31, 2025

Philip J. Weiser, Attorney General, Austin R. Johnston, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jessica A. Pitts, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1       Damaige Dominic Plascencia appeals his conviction on one count of sexual assault (submission against will), one count of second degree kidnapping, and one count of second degree burglary.  We affirm.

I.       Background

¶ 2       A jury could have reasonably found the following facts from the evidence introduced at trial.

¶ 3       In 2016, the victim lived in an apartment with her daughter J.D. and her grandson, who is J.D. and Plascencia's son.  For most of 2016, Plascencia also lived in the apartment.

¶ 4       That fall, Plascencia moved out of the apartment and returned his apartment key to J.D.  But the key was the type that could easily be copied at "any hardware store."

¶ 5       On the night of the assault, the victim was taking a shower when the apartment lights went out.  She stepped out of the shower, wrapped herself in a towel, and found her way to her bedroom to look for her phone.  After the victim took two or three steps into her bedroom, a man grabbed her.

¶ 6       As the victim screamed and struggled to free herself, the man repeatedly said, "Shh, shh."  Although the man said nothing else

1

during the incident, the victim said she thought she recognized Plascencia's voice when he said, "Shh, shh." The man moved the victim to J.D.'s bedroom. Once inside J.D.'s bedroom, the man held the victim against the bed and penetrated her vagina with his penis.

¶ 7 The man left the apartment following the assault. After he left, the victim walked to the kitchen and found the apartment fuse box open. It had been closed earlier that night. The lights turned back on when the victim flipped the switches in the fuse box. There was no sign of forced entry into the apartment.

¶ 8 The victim called the police to report the assault. She described to the officers the "build and size" of her attacker, which were similar to those of Plascencia.

¶ 9 After the victim called the police to report the assault, officers took her to a hospital, where a sexual assault nurse examiner (SANE) examined her. The SANE collected DNA swabs from the victim to complete a sexual assault kit.

¶ 10 Yvonne Woods, a state crime lab analyst, tested the swabs and found male DNA. She compared that male DNA to Plascencia's DNA, which Detective Shawn Holmes had obtained from a buccal swab taken from Plascencia during an interview at a police station.

¶ 11    The male DNA collected from the victim matched Plascencia's patrilineal DNA, meaning that "Plascencia and all of his paternal male relatives [were] not excluded as potential donors" to the DNA found on the victim.  In addition, Woods testified that a mixed DNA profile taken from one of the swabs was thirty-four times more likely to be comprised of DNA of the victim and Plascencia than DNA of the victim and an unknown person.  Woods said that this finding provided "limited support to the proposition that [Plascencia was] included as a donor" to the mixed DNA profile.

¶ 12    The police arrested Plascencia shortly after receiving the DNA test results.  Detective Holmes told J.D. about the DNA results before Plascencia's arrest.  Shortly thereafter, Plascencia's mother called J.D. to encourage her to tell the police that the victim and Plascencia "were sleeping together," which J.D. did not do.

¶ 13    At trial, defense counsel challenged the victim's credibility and the DNA evidence, but counsel did not ask the trial court to suppress such evidence.

¶ 14    The jury convicted Plascencia of sexual assault (submission against will), second degree kidnapping, and second degree

burglary. The court sentenced Plascencia to ten years to life in the custody of the Department of Corrections.

¶ 15 On appeal, Plascencia contends that the court plainly erred by (1) admitting evidence of the DNA obtained from the buccal swab because Detective Holmes allegedly coerced Plascencia into consenting to the swab, and (2) permitting the prosecutor to misstate the law during closing argument. We disagree.

## II. Analysis

### A. The Court Did Not Plainly Err by Not Ruling Sua Sponte that the DNA Evidence Was Inadmissible

#### 1. Standard of Review

¶ 16 "[W]e defer to the trial court's findings of fact when they are supported by the record but review its legal conclusions de novo." *People v. Alemayehu*, 2021 COA 69, ¶ 24, 494 P.3d 98, 104.

¶ 17 The parties agree that Plascencia did not preserve his contention that he had not voluntarily consented to the buccal swab. We review errors that "were not preserved by objection for plain error." *Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116, 120.

4

¶ 18    An error is plain only if it is "obvious and substantial." *Id.* An error is obvious if it is "so clear-cut" that "a trial judge should be able to avoid it without benefit of objection." *People v. Crabtree*, 2024 CO 40M, ¶ 42, 550 P.3d 656, 667 (quoting *Romero v. People*, 2017 CO 37, ¶ 6, 393 P.3d 973, 976). The defendant bears the burden to establish that an error occurred and that it was obvious and substantial. *See Kaufman v. People*, 202 P.3d 542, 549 (Colo. 2009).

¶ 19    "At best, plain error is strong medicine." *People v. Ujaama*, 2012 COA 36, ¶ 40, 302 P.3d 296, 304 (quoting *United States v. Simmonds*, 931 F.2d 685, 687 (10th Cir. 1991)). "It should provide a basis for relief only on rare occasions" because "it is difficult to 'fault a trial court for failing to rule on an issue that had not been presented to it . . . .'" *Id.* (quoting *Simmonds*, 931 F.2d at 688). In addition, "an accused should not be able to 'withhold his objections until completion of his trial . . . and later complain of matters which, if he had made a timely objection, would have allowed the trial court to take corrective action.'" *Id.* (quoting *People v. Rollins*, 892 P.2d 866, 874 n.13 (Colo. 1995)).

¶ 20    Under the plain error standard, "we need not decide whether the court actually erred if it is clear that the alleged error was not obvious." *People v. Vigil*, 251 P.3d 442, 447 (Colo. App. 2010).

### 2.    Additional Facts

¶ 21    Detective Holmes attempted to contact Plascencia the day after the assault.  He left a voice message on Plascencia's phone in which he identified himself, told Plascencia that he needed to speak with him, and asked Plascencia to give him "a call back."  Detective Holmes did not say that Plascencia was required to meet with him. Plascencia did not call Detective Holmes back.

¶ 22    When Detective Holmes learned that the biological evidence obtained from the SANE examination indicated the presence of male DNA, Detective Holmes arranged an interview with Plascencia at a police station.  Plascencia voluntarily appeared at the police station, accompanied by his father.  Detective Holmes escorted Plascencia to an interview room and told him that he was "free to leave at any time."  A video camera recorded Plascencia's interview.

¶ 23    Detective Holmes asked Plascencia where he worked, and requested his mother's name, her contact information, and his

social security number. Plascencia refused to answer these basic questions.

¶ 24    Detective Holmes asked Plascencia if he knew why he was at the police station. Plascencia said it was because the victim "got attacked." Plascencia told Detective Holmes that he was conducting his own investigation into the attack. But he said that, through his investigation, he had only learned that, on the night of the assault, "someone tried to break into one of [his] other buddy's house[s]." Plascencia would not disclose the names of his "other buddy" or the individuals with whom Plascencia said he discussed the attack on the victim.

¶ 25    Detective Holmes took a break in the interview after about thirty-five minutes. After Detective Holmes left the room, Detective Brian Hunziker, who worked for a different law enforcement agency, entered. Detective Hunziker asked Plascencia about an unrelated sexual assault and noted that DNA evidence linked Plascencia to that assault. At the beginning of Detective Hunziker's interview with Plascencia, Detective Hunziker reminded Plascencia that the interview room door was "not locked" and said he could "leave at any time."

¶ 26 During Detective Hunziker's interview with Plascencia, which lasted about fifteen minutes, Plascencia asked if he could use the restroom, and Detective Hunziker said he could do so. Plascencia left the interview room to use the restroom and then returned.

¶ 27 When Plascencia returned, he said that he wanted to leave the police station. Detective Hunziker responded that Plascencia could not leave yet because Detective Holmes still had a question for him.

¶ 28 When Detective Holmes returned to the interview room, he said that the victim's case had "nothing to do with [Detective Hunziker's] case." But he noted that, as in Detective Hunziker's case, there was "some DNA evidence in [the victim's] case." For that reason, he asked whether Plascencia would "mind if [Detective Holmes] took" a buccal swab. Detective Holmes explained it was a Q-tip that he would use to swab the inside of Plascencia's cheek to obtain a DNA sample "to make sure that [Plascencia's] DNA d[id] not match" the DNA collected from the victim. Plascencia asked, "What DNA?"

¶ 29 After Detective Holmes further explained the process of collecting Plascencia's DNA, Plascencia said, "You can't put nothing in my mouth." Detective Holmes again asked Plascencia whether

he would be "willing to submit to giving" a buccal swab. Plascencia responded, "I'm not going to submit to nothing."

¶ 30    When Detective Holmes stepped back into the doorway of the interview room, Plascencia asked again if he could leave. Detective Hunziker, who had been standing in the room, then told Plascencia he was "under arrest" in the case that Detective Hunziker was investigating.

¶ 31    While Detective Hunziker prepared to arrest Plascencia, Detective Holmes again asked Plascencia if he would provide a DNA sample "just to rule [him] out" as a "suspect" in the victim's case. Detective Holmes reiterated that Plascencia's decision to provide the sample was "entirely voluntary." Plascencia asked, "What's a suspect?" Detective Holmes explained it was "somebody that may or may not have committed a crime." Plascencia said, "Well, I didn't."

¶ 32    Detective Holmes repeated that Plascencia could prove he did not attack the victim by providing a DNA sample. Plascencia responded, "You can go ahead." Detective Holmes sought to confirm that "I can go ahead, what? I can go ahead and take a sample?" Plascencia asked why Detective Holmes needed a sample

of his DNA, and Detective Holmes again explained that it could rule Plascencia out as a suspect in the victim's case. Plascencia said, "No, I don't want you to do that."

¶ 33 After Detective Hunziker provided Plascencia with additional information regarding his arrest and transportation to jail, Detective Holmes asked, "So I'm clear, you don't want to give me your DNA. Is that right?" Plascencia said, "You don't need it, dude." Detective Holmes again explained that the fastest way to rule Plascencia out as a suspect in the victim's case would be for Plascencia to provide a DNA sample.

¶ 34 Plascencia then asked what would happen if he declined to provide a DNA sample. Detective Holmes responded, "Then I go to the judge, and I get a warrant, and then I come swab your cheek." Plascencia replied, "Swab it. My cheek. Do whatever." At that point, Detective Holmes conducted the buccal swab.

¶ 35 Plascencia filed a pretrial motion to suppress statements that he made during the interview. He did not seek to suppress the DNA evidence obtained through the buccal swab, however. Even though Plascencia did not ask the court to exclude that evidence, in its

ruling on the motion to suppress, the court found that Plascencia had "agreed to take" the buccal swab.

### 3. It Was Not Obvious that Plascencia May Not Have Voluntarily Consented to the Buccal Swab

¶ 36 Plascencia contends that the trial court plainly erred by failing to suppress the DNA evidence, without a request from defense counsel, because Plascencia allegedly did not voluntarily consent to the swab. We disagree.

¶ 37 Because Plascencia did not ask the court to suppress the DNA evidence, we review for plain error. *See Crabtree*, ¶ 3, 550 P.3d at 660. Thus, we consider whether the court's alleged error in not suppressing the DNA evidence obtained through the buccal swab was obvious — whether it was "so clear-cut" that the "trial judge should [have been] able to avoid it without benefit of objection." *Id.* at ¶ 42, 550 P.3d at 667 (quoting *Romero*, ¶ 6, 393 P.3d at 976).

¶ 38 The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "'[U]sing a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search' for purposes of the Fourth

11

Amendment." *Casillas v. People*, 2018 CO 78M, ¶ 16, 427 P.3d 804, 809 (quoting *Maryland v. King*, 569 U.S. 435, 446 (2013)).

¶ 39    "'Warrantless searches are presumptively unreasonable,' and thus unconstitutional, unless an exception to the warrant requirement exists." *People v. McKnight*, 2019 CO 36, ¶ 23, 446 P.3d 397, 402 (quoting *United States v. Karo*, 468 U.S. 705, 717 (1984)).  One of those exceptions is consent — "A warrantless search may be justified and is constitutionally permissible when a citizen consents to the search." *People v. Ganaway*, 2025 CO 25, ¶ 37, 568 P.3d 780, 789 (quoting *People v. Mendoza-Balderama*, 981 P.2d 150, 156 (Colo. 1999)).

¶ 40    "Consent can be express or 'implied through words, actions, or both.'" *Id.* (quoting *People v. Berdahl*, 2019 CO 29, ¶ 22, 440 P.3d 437, 442).  "Involuntary consent is invalid." *Id.* at ¶ 38, 568 P.3d at 789.  "Voluntary consent requires 'essentially free and unconstrained choice by its maker.'" *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).  In contrast, involuntary consent is "coerced by threats or force, or granted only in submission to a claim of lawful authority." *Id.* (quoting *Schneckloth*, 412 U.S. at 233).

¶ 41    "To assess whether a person's consent was voluntary, courts must apply an objective test that takes into account the totality of the circumstances and determines whether the defendant could reasonably have construed the police conduct to be coercive." *Berdahl*, ¶ 23, 440 P.3d at 442.  When making findings under the objective test, courts must consider "whether, under the totality of the circumstances, the police's conduct overbore the defendant's exercise of free will because it was sufficiently coercive or deceptive to a person with his characteristics in his circumstances." *People v. Munoz-Gutierrez,* 2015 CO 9, ¶ 24, 342 P.3d 439, 445.

¶ 42    Thus, in evaluating the totality of the circumstances, courts consider the following: "the defendant's age, education, and intelligence; the duration, location, and circumstances of the search; the defendant's state of mind; and any other factors that could have affected the defendant's free and unconstrained choice in consenting to the search." *Ganaway*, ¶ 39, 568 P.3d at 789-90 (quoting *Berdahl,* ¶ 23, 440 P.3d at 442).  "The voluntariness of consent to search is a factual question . . . ." *United States v. Contreras*, 149 F.4th 349, 374 (4th Cir. 2025) (quoting *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996)).

13

¶ 43    For six reasons, we conclude that it was not obvious to the trial court that Plascencia may not have voluntarily consented to the buccal swab.

¶ 44    First, the video recording of the interview indicates that Plascencia "knew he had a choice" not to consent to the buccal swab. *People v. Chavez-Barragan*, 2016 CO 66, ¶ 38, 379 P.3d 330, 339. Detective Holmes twice told Plascencia that his decision to provide a DNA sample through a buccal swab was "entirely voluntary."

¶ 45    Second, contrary to Plascencia's assertion, the detectives did not wear Plascencia down. *See id.* As Plascencia concedes, less than ten minutes elapsed between when Detective Holmes first asked him whether he would submit to a buccal swab and when Plascencia gave his consent. And while Detective Holmes repeatedly asked for Plascencia's consent, Plascencia's vague and inconsistent responses necessitated Detective Holmes's follow-up questions.

¶ 46    Third, there was no language barrier between Plascencia and Detective Holmes. *See id.*

¶ 47    Fourth, only two officers — Detective Holmes and Detective Hunziker — were present at the interview.  Neither drew a weapon in Plascencia's presence.  *See People v. Dotson*, 55 P.3d 175, 179-80 (Colo. App. 2002).  Moreover, the trial court found that the interview's tone was "conversational" and not "threatening" or "demanding"; "[v]oices weren't raised"; "[a]t one point [Plascencia] needed to use the restroom, and he was allowed to do that"; and Plascencia was not handcuffed.  The video recording of the interview supports the court's findings, and we must give deference to them.  *See Alemayehu*, ¶ 24, 494 P.3d at 104.

¶ 48    Although it was arguably coercive for Detective Holmes to obtain Plascencia's consent to submit to the buccal swab only after Detective Hunziker told Plascencia that he was not free to leave, we cannot say that any error in not suppressing the DNA evidence was obvious under the circumstances, particularly given the fact-based nature of the test for consent.

¶ 49    Fifth, the detectives did not make affirmative misrepresentations to Plascencia.  *See Turbyne v. People*, 151 P.3d 563, 572 (Colo. 2007).  Plascencia contends that, contrary to Detective Holmes's assertion that he would obtain a search warrant

15

to obtain a buccal swab, a court would not have granted a Crim. P. 41.1 order for a compelled buccal swab because, at the time of the interview, the only evidence linking Plascencia to the attack was his relationship with J.D. and his prior residence in the victim's apartment.

¶ 50 A Crim. P. 41.1 order for nontestimonial evidence, such as DNA evidence, requires a showing of "reasonable grounds, not amounting to probable cause to arrest, to suspect that the person named . . . committed the offense." Crim. P. 41.1(c)(2). In light of the evidence linking Plascencia to the assault, including the victim's statements, Plascencia's one-time possession of a key to the apartment, and the lack of evidence of forced entry to the apartment on the night of the assault, we cannot say that the court should have sua sponte concluded that, at the time of the interview in the police station, Detective Holmes did not possess reasonable grounds to suspect that Plascencia was the attacker.

¶ 51 Sixth, as noted above, the trial court found that Plascencia "agreed to take" the buccal swab at the police department.

¶ 52 Accordingly, we conclude that, under the totality of the circumstances, *see Munoz-Gutierrez*, ¶ 24, 342 P.3d at 445, it was

not obvious to the trial court that Detective Holmes may have coerced Plascencia into consenting to the buccal swab, *see Crabtree*, ¶ 42, 550 P.3d at 667.

¶ 53 Nonetheless, Plascencia contends that, for two reasons, it was obvious to the trial court that he did not voluntarily agree to the buccal swab. We disagree.

¶ 54 First, we reject Plascencia's contention that it was obvious he did not voluntarily consent to the buccal swab because he appeared at the police station for the interview only after "Detective Holmes had called [him] numerous times." *See Ganaway*, ¶ 39, 568 P.3d at 789-90. The number of times that Detective Holmes attempted to contact Plascencia by telephone does not establish coercion. *See People v. Munoz-Diaz*, 2023 COA 105, ¶ 17, 543 P.3d 402, 407 (noting that contacting a defendant by phone "ma[kes] it easier for [the defendant] to disengage and feel unthreatened"). He relatedly argues that it is "unclear whether [Detective Holmes] told Plascencia he was required" to submit to questions at the police station based on Detective Holmes's testimony that he did not tell Plascencia he "had to come in [for the interview] and speak to" Detective Holmes.

¶ 55     But this alleged lack of clarity undercuts Plascencia's

obviousness argument.  At most, the evidence was contradictory as

to whether Plascencia believed he had no choice but to speak with

Detective Holmes.  Detective Holmes's contrary testimony that he

did not make any threats or promises to Plascencia to persuade him

to participate in the interview could not make it obvious to the trial

court that Plascencia did not consent to the buccal swab.

¶ 56     Second, Plascencia asserts that he was "a young adult with

limited education and intellectual ability and was thus more

susceptible to police coercion."  But even if this statement is

accurate, Plascencia never argued at the suppression hearing that

the court should exclude the DNA evidence obtained from the

buccal swab.  Under the circumstances, the court lacked a factual

basis for considering whether Plascencia was "more susceptible to

police coercion" because of his "limited education and intellectual

ability."

¶ 57     Moreover, the information regarding Plascencia's "limited

education and intellectual ability" derived from a competency

evaluation performed months after the suppression hearing and a

post-trial offense-specific evaluation contained in the adult sex

18

offender presentence report. Significantly, neither the evaluation nor the report said that Plascencia was susceptible to coercion. So even if the report and evaluation were available to the court before the suppression hearing, they would not have made it obvious to the trial court that Plascencia involuntarily consented to the buccal swab because he was susceptible to coercion — or for any other reason.

¶ 58 Accordingly, we hold that the court did not plainly err by not sua sponte suppressing the DNA evidence obtained from the buccal swab.

### B. The Court Did Not Plainly Err by Allowing the Prosecutor's Closing Argument

#### 1. Standard of Review

¶ 59 "In a claim of prosecutorial misconduct, the reviewing court engages in a two-step analysis." *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 60 First, we "must determine whether the prosecutor's questionable conduct was improper based on the totality of the circumstances." *Id.* And "[w]e must evaluate claims of improper argument in the context of the argument as a whole and in light of

19

the evidence before the jury." *People v. Samson*, 2012 COA 167, ¶ 30, 302 P.3d 311, 316.

¶ 61    Second, we must determine "whether [the prosecutor's improper] actions warrant reversal according to the proper standard of review." *Wend*, 235 P.3d at 1096.

¶ 62    The parties agree that Plascencia did not preserve his prosecutorial misconduct argument. For this reason, "we apply a plain error standard of review." *Id.* at 1097. Under this standard, the defendant bears the burden to establish that an error occurred and that it was obvious and substantial. *See Kaufman*, 202 P.3d at 549.

¶ 63    "In the context of plain error review of prosecutorial misconduct, we will only reverse when the misconduct was 'flagrantly, glaringly, or tremendously improper.'" *People v. Robinson*, 2019 CO 102, ¶ 19, 454 P.3d 229, 233 (quoting *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005)). "Defense counsel's failure to object is a factor that may be considered in examining the impact of a prosecutor's argument and may 'demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging.'"

*People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010) (quoting *People v. Rodriguez*, 794 P.2d 965, 972 (Colo. 1990)), *overruled on other grounds by*, *People v. Kennedy*, 2025 CO 63, ¶ 22 & n.2, ___ P.3d ___, ___. In addition, "[p]rosecutorial misconduct in closing argument rarely constitutes plain error." *Id.* at 1152-53.

## 2. Additional Facts

¶ 64 Defense counsel attacked the victim's credibility from the inception of the trial. Defense counsel began her opening statement by saying the victim was "trying to tie" Plascencia to the assault because of "animosity" between them. According to defense counsel, the animosity arose from the end of Plascencia's relationship with J.D. and "difficulty . . . over custody" of J.D. and Plascencia's son. In addition, defense counsel said in her opening that the victim's statements "don't make a lot of sense" and seem to be "reaching."

¶ 65 The prosecutor began her closing argument by defending the victim's credibility: "[I]f you believed [the victim], then [Plascencia] is guilty." The prosecutor explained that the jury must focus on the evidence: "If you believe [the victim] and if you believe that we've got the right person . . . , he's been correctly charged, and the law is

violated." Further, the prosecutor said, "[This is] a case about the facts. What do you believe happened? If you believe [the victim] was the victim of a sexual assault in her home, then he is guilty because the evidence points to one place and one place only" — Plascencia.

¶ 66 Next, the prosecutor outlined the evidence that she said established Plascencia's guilt, including the DNA test results and Plascencia's mother's statement to J.D. that she should tell the police that the victim and Plascencia "were sleeping together." The prosecutor ended her closing argument by returning to the victim's credibility: "Ladies and gentlemen, if you believe [the victim] that this happened — and there's no reason not to, and there's a lot of reasons to believe that it did, then [Plascencia] is guilty."

¶ 67 Defense counsel resumed her attack on the victim's credibility during her closing argument, saying there was "a lot that [the victim] doesn't remember," "a lot that she actually changed," and that the victim's account of the incident was inconsistent.

¶ 68 The prosecutor began her rebuttal closing by saying, "This is not a who-done-it case. This is a he-done-it case." She then said, "How do we know it's [Plascencia]?" and reminded the jury of the

DNA evidence.  At the end of her rebuttal closing, the prosecutor reiterated, "[I]f [J.D.] and [the victim] are telling the truth, then this is not a who-done-it case, it's a he-done-it case."

### 3.    The Prosecutor Did Not Misstate the Law

¶ 69    Plascencia contends that the trial court committed reversible error by allowing the prosecutor to misstate the law by telling the jury that Plascencia must be guilty if it believed the victim.  We disagree.

¶ 70    "[P]rosecutors have wide latitude in the language and style they choose to employ, as well as in replying to an argument by opposing counsel."  *Samson*, ¶ 30, 302 P.3d at 317.  A prosecutor may not "misstate or misinterpret the law," however.  *People v. Marko*, 2015 COA 139, ¶ 207, 434 P.3d 618, 657, *aff'd on other grounds*, 2018 CO 97, 432 P.3d 607.

¶ 71    In closing argument, a prosecutor "may employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance, so long as [she] does not thereby induce the jury to determine guilt on the basis of passion or prejudice, attempt to inject irrelevant issues into the case, or accomplish some other improper purpose."  *People v. Allee*, 77 P.3d 831, 837 (Colo. App.

2003).  Further, "because arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful."  *Samson*, ¶ 30, 302 P.3d at 317.

¶ 72    A prosecutor may not argue that a jury can only acquit the defendant if it finds that a prosecution witness lied.  *People v. Cuellar*, 2023 COA 20, ¶¶ 56-68, 530 P.3d 1236, 1248-50 (concluding that the prosecutor's assertion that, to find the defendant not guilty of sexual assault, the jury had "to believe that [the victim] 'fabricated this whole entire thing, that she lied,'" was improper).  However, a prosecutor may argue in closing that a witness is credible so long as the argument is based on reasonable inferences drawn from the evidence.  *See People v. Brown*, 313 P.3d 608, 617-18 (Colo. App. 2011).

¶ 73    The prosecutor did not argue that the jury could only acquit Plascencia if it found that the victim lied.  Rather, she argued that it should find Plascencia guilty if it *believed* the victim.  Thus, the prosecutor's statements materially differ from the improper argument in *Cuellar*.  *See Cuellar*, ¶ 69, 530 P.3d at 1250.

¶ 74    Unlike the argument in *Cuellar*, the prosecutor recognized "numerous alternative explanations for evidentiary discrepancies and conflicts that d[id] not involve [the victim] lying," including "differences in opinion, lapses or inaccuracies in memory, differences in perception, a misunderstanding, or any other number of wholly innocent explanations for discrepancies between one witness's testimony and another's." *Liggett v. People*, 135 P.3d 725, 731 (Colo. 2006).  Therefore, the prosecutor properly focused on the jury's role to determine the victim's credibility.

¶ 75    Further, the prosecutor's statements about believing the victim were a direct response to defense counsel's attacks on the victim's credibility and suggestion that the assault never occurred. "As [the] defendant himself opened the door on this subject, he invited rebuttal by the prosecution and cannot now complain that the trial court improperly permitted such comment." *People v. Saiz*, 660 P.2d 2, 5 (Colo. App. 1982); *see People v. Conyac*, 2014 COA 8M, ¶ 133, 361 P.3d 1005, 1028 (A prosecutor "has considerable latitude in replying to opposing counsel's arguments.").

¶ 76    In sum, because the prosecutor asked the jury to *believe* the victim's account and did not suggest it could only acquit Plascencia

if it found that the victim "fabricate[d] [the] whole entire thing," *Cuellar*, ¶ 56, 530 P.3d at 1248, the prosecutor did not misstate the law, *see Wend*, 235 P.3d at 1096.

¶ 77    Plascencia further argues that the prosecutor's argument regarding the victim's credibility misstated the law because the victim's "testimony did not establish identity."  We disagree with this assertion, as well.

¶ 78    In her closing argument, the prosecutor did not say that the jury could convict Plascencia solely based on the victim's testimony. For example, the prosecutor told the jury to consider the victim's testimony together with the prosecution's identity evidence: "If you believe [the victim] and if you believe that we've got the right person . . . , [then Plascencia has] been correctly charged."  In addition, the prosecutor said, "If you believe [the victim] was the victim of a sexual assault in her home, then [Plascencia] is guilty because the [identity] evidence points to one place and one place only . . . , and it points to [Plascencia]."

¶ 79    Accordingly, "in the context of the argument as a whole and in light of the evidence before the jury," *Samson*, ¶ 30, 302 P.3d at 316, the prosecutor's argument, "[I]f you believed [the victim], then

26

[Plascencia] is guilty," did not communicate the message that the jury should convict Plascencia based only on the victim's testimony.

## III.   Disposition

¶ 80    The judgment is affirmed.

JUDGE DUNN and JUDGE KUHN concur.