Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
September 26, 2016

**2016 CO 66**

**No. 16SA133, <u>People v. Chavez-Barragan</u>—Fourth Amendment—Traffic Stops—
Reasonableness of Investigatory Detention—Voluntariness of Consent to Search.**

In this decision, the supreme court reverses the trial court's order suppressing drugs found in the defendant's truck and the defendant's incriminating statements made to police after they discovered the drugs.  The defendant was pulled over for a traffic violation and detained after he consented to a police search of his truck.  The supreme court concludes that this investigatory detention, which resulted from the defendant's authorization of the search, was reasonable.  After considering the totality of the circumstances, the supreme court also concludes that the defendant's consent to the search was voluntary and the search was lawful.  Accordingly, the supreme court determines that no prior illegality tainted the defendant's incriminating statements.  Therefore, neither the drugs nor the statements should have been suppressed.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

### 2016 CO 66

### Supreme Court Case No. 16SA133
*Interlocutory Appeal from the District Court*
Morgan County District Court Case No. 14CR245
Honorable Douglas R. Vannoy, Judge

### Plaintiff-Appellant:

The People of the State of Colorado,

v.

### Defendant-Appellee:

Amadeo Chavez-Barragan.

### Order Reversed
*en banc*
September 26, 2016

**Attorneys for Plaintiff-Appellant:**
Brittny B. Lewton, District Attorney, Thirteenth Judicial District
Robert C. James, Deputy District Attorney
  *Fort Morgan, Colorado*

**Attorney for Defendant-Appellee:**
Frank Moya
  *Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.

¶1     This is the second of two interlocutory appeals in this case.  Both resulted from orders of the Morgan County District Court suppressing methamphetamine found in the defendant's truck and the defendant's incriminating statements to police after they discovered the drugs.

¶2     In the first appeal, we reversed the trial court's order suppressing this evidence because we concluded that police lawfully stopped the defendant, Amadeo Chavez-Barragan, for failure to drive within a single lane (commonly known as weaving).  Because the trial court had not ruled on other issues raised in the suppression motion, such as the voluntariness of Chavez-Barragan's alleged consent to the search that revealed the drugs, our ruling was limited: We determined only that the initial stop was constitutional.

¶3     On remand, the trial court again suppressed the evidence.  It concluded that the seizure that followed the initial stop was unreasonable.  It also concluded that Chavez-Barragan's consent to the search was involuntary because he was seized when he consented and coercive police conduct overbore his will.  Because it determined the consent to search was invalid, the trial court suppressed the methamphetamine.  And because Chavez-Barragan's incriminating statements came on the heels of what it perceived as an invalid search, the trial court decided the statements were tainted and suppressed them as well.  The People appealed a second time.

¶4     We again reverse the trial court's suppression order.  We conclude on the facts presented here that the investigatory detention following the traffic stop was reasonable and that Chavez-Barragan's consent to the search was voluntary.  Thus, the drugs

2

found in the truck should not have been suppressed.  And because no illegal police conduct preceded Chavez-Barragan's statements, the trial court erred in suppressing them as fruit of the poisonous tree.

## I. Facts and Procedural History

¶5    Just before 3:00 a.m. on October 11, 2014, Morgan County Sheriff's Deputy Shawna Ponce pulled over Chavez-Barragan, who was driving a semi-truck on Interstate 76.  As set forth in People v. Chavez-Barragan, 2016 CO 16, ¶ 2, 365 P.3d 981, 982, members of a federal drug task force began following Chavez-Barragan after seeing him in the company of an individual under investigation.  After a task force member asked Deputy Ponce to develop a basis for a traffic stop, she pulled the defendant over for weaving in violation of section 42-4-1007(1)(a), C.R.S. (2016).  Chavez-Barragan, ¶¶ 3–6, 365 P.3d at 982.  The People did not assert that suspicion of drug activity justified the stop.  Id. at ¶ 7, 365 P.3d at 982.  We upheld the stop on the basis of the suspected traffic offense.  Id. at ¶ 23, 365 P.3d at 986.  This case picks up factually where that one left off.[1]

---

[1] The record contains a dash-cam video from Deputy Ponce's patrol car.  Because the video did not capture the driving that justified the initial stop, we did not rely on it in our previous decision, but the recording is relevant to the issues now before us. It captured most of what happened after the stop, including audio of conversations that took place within the patrol car.  We have independently reviewed the recording as we have done in other cases, see People v. Madrid, 179 P.3d 1010, 1014 (Colo. 2008) (noting that this court sits in a similar position as the trial court when there is an audio-visual record and no disputed facts outside the recording); see also People v. Kutlak, 2016 CO 1, ¶ 12, 364 P.3d 199, 203 (concluding defendant did not unambiguously request counsel based on independent review of video interrogation), but important portions of this encounter — such as the conversations outside the car — were not captured in the recording, and we thus defer to the trial court's record-supported factual findings,

¶6    After the truck pulled over, Deputy Ponce motioned for the driver to step out of the truck. Chavez-Barragan, the truck's only occupant, complied. The two had a brief conversation near the back of the truck during which Deputy Ponce explained the reason for the stop and asked Chavez-Barragan whether he had any weapons on him. The defendant said no but agreed to a pat down; Deputy Ponce found no weapons. The two then walked to the front of the truck and soon returned with Chavez-Barragan carrying what the trial court described as a "log book." About this time, Deputy Ponce took possession of Chavez-Barragan's driver's license, vehicle registration, and proof of insurance.[2]

¶7    Deputy Ponce asked Chavez-Barragan whether the truck contained any drugs, weapons, or large quantities of cash. After Chavez-Barragan responded no, she asked if it would be okay for her to search the truck. He said yes. This conversation took place in the first three minutes of the traffic stop.

¶8    Feeling it was "pretty cold outside," and noticing that Chavez-Barragan was dressed less warmly than she was, Deputy Ponce asked Chavez-Barragan whether he wanted to sit in her patrol car. She testified that she simply wanted the two of them to be warm while Chavez-Barragan completed a written consent-to-search form. She did

which were made after hearing live testimony. We perceive no conflict between the trial court's findings and the video recording.

[2] The trial court did not make a finding as to exactly when Deputy Ponce took possession of Chavez-Barragan's documents, but it found that she collected them before obtaining written consent to search. The parties dispute whether she had the documents in hand when she asked to search the truck, but this dispute is immaterial to our analysis because there is no disagreement that Chavez-Barragan was seized at the time Deputy Ponce requested consent to search the truck.

4

not testify whether Chavez-Barragan embraced her invitation to sit in the car, and she could not recall who opened the car's front door. The trial court found that Deputy Ponce "directed" Chavez-Barragan to sit in the vehicle's front seat. While he was in the patrol car, Chavez-Barragan was unrestrained and the door was unlocked. Once he sat down, Deputy Ponce conferred outside the car with other officers who had arrived.

¶9 At 3:04 a.m., about eight minutes after the initial stop, Deputy Ponce re-entered her car and explained to the defendant that no search had begun and that her partner, Deputy Campbell, would remain with Chavez-Barragan in the patrol car while Deputy Ponce searched the truck. She told the defendant he could tell Deputy Campbell to terminate the search at any time. She asked, "You okay with that?" Chavez-Barragan said, "Sounds good."

¶10 Deputy Ponce then handed Chavez-Barragan an English-language consent form, but he said he could read English only "a little." Because he stated he could read Spanish, Deputy Ponce provided him with a Spanish-language form. That form stated that the defendant could refuse to consent to the search. Deputy Ponce completed the vehicle description portion, and Chavez-Barragan signed the form.

¶11 Deputy Ponce asked Chavez-Barragan if he had any questions, and when he did not respond, she reiterated that he could tell Deputy Campbell to stop the search and that she would abide by his decision. She then asked what Chavez-Barragan was hauling. He said the trailer contained plastic. Asked if there was anything illegal in the trailer or the cab, Chavez-Barragan said there was not. She asked, "So, it's okay that I search the cab of the truck?" Chavez-Barragan replied, "Sure." And when Deputy

5

Ponce explained that meant she was "going to look in there," he said, "Check, no problem."

¶12 Officers began searching the truck around 3:10 a.m., about fourteen minutes after the initial stop. Chavez-Barragan and Deputy Campbell observed from the patrol car and made small talk. About twenty minutes into the search, plain-clothes officers attempted to search the truck's trailer; Chavez-Barragan made no objection. On the contrary, he offered to retrieve the trailer keys. A few minutes after 4:00 a.m., the search moved to the truck's engine compartment, where deputies discovered a package containing methamphetamine.[3]

¶13 Officers confronted Chavez-Barragan with this discovery, and he made incriminating statements. After the search, Deputy Ponce called Chavez-Barragan's ID into dispatch; she returned his driving documents sometime after 4:30 a.m.

---

[3] Chavez-Barragan argued below that his consent, if voluntary at all, extended only to a search of the cab and trailer of the truck. Thus, he contended the search of the truck's engine compartment exceeded the scope of his consent. He also argued that, because he only authorized Deputy Ponce to search the truck, the participation of additional officers also exceeded the scope of his consent. The trial court rejected these arguments. It found that the context of the entire conversation, including what Deputy Ponce said outside the patrol car, made it clear the search request covered all parts of the truck where illegal drugs, weapons, or large amounts of cash could be found. The trial court also found that the truck was a large vehicle and that a reasonable person in the defendant's position would understand other officers would assist with the search. Moreover, Chavez-Barragan expressed no surprise or objection when he observed the other officers searching the truck's trailer. Because the scope-of-consent issue was decided adversely to Chavez-Barragan, it is not before us. See People v. Weston, 869 P.2d 1293, 1297 (Colo. 1994) ("[I]f the district court resolves a suppression issue against the defendant, we have no jurisdiction to address it in an interlocutory appeal.").

6

¶14 The People charged Chavez-Barragan with possession with intent to manufacture or distribute a controlled substance (more than 112 grams). See § 18-18-405(1), (2)(a)(I)(B), C.R.S. (2016). He moved to suppress the drugs and his statements, and the trial court granted these motions because it concluded the initial stop was illegal. The People filed an interlocutory appeal, and we reversed. Chavez-Barragan, ¶ 24, 365 P.3d at 986.

¶15 On remand, the trial court concluded that the traffic seizure was unreasonable and thus unconstitutional. The trial court also concluded that the People failed to prove the defendant's consent was voluntary. It therefore suppressed the methamphetamine and likewise suppressed the statements as fruit of the illegal search.

¶16 The People again sought interlocutory review pursuant to section 16-12-102(2), C.R.S. (2016), and C.A.R. 4.1.

## II. Analysis

¶17 We begin by considering the circumstances surrounding the investigatory detention following the initial traffic stop. Because the duration of the detention resulted from the search of the truck that Chavez-Barragan purportedly authorized, we then assess whether he voluntarily consented to the search. Under the totality of the circumstances presented here, we conclude his consent was voluntary. The search, therefore, was lawful. Finally, we address Chavez-Barragan's statements and determine they should not have been suppressed as fruit of the poisonous tree. The seizure and search that preceded his admissions were both reasonable, and thus no

prior illegality tainted the statements. Accordingly, we reverse the trial court's suppression order.

## A. Scope and Duration of Traffic Stop

### 1. Standard of Review

¶18 A trial court's suppression order raises mixed questions of fact and law. People v. Munoz-Gutierrez, 2015 CO 9, ¶ 14, 342 P.3d 439, 443. "We defer to the trial court's factual findings that are supported by competent evidence but review the legal effect of those facts de novo." Id.

### 2. Reasonableness

¶19 In Colorado, there are three general types of police-citizen encounters: (1) arrests, (2) investigatory stops, and (3) consensual interviews. People v. Cervantes-Arredondo, 17 P.3d 141, 146 (Colo. 2001). Traffic stops typically fall into the second category because they are limited, investigatory intrusions. See Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) ("'[A] relatively brief encounter,' a routine traffic stop is 'more analogous to a so-called "Terry stop"[4] . . . than to a formal arrest.'" (alterations in original) (quoting Knowles v. Iowa, 525 U.S. 133, 117 (1998))); Cervantes-Arredondo, 17 P.3d at 147 ("Traffic stops are usually investigatory stops . . . ."). Investigatory stops must be supported by reasonable suspicion. Ornelas v. United States, 517 U.S. 690, 693 (1996) ("An investigatory stop is permissible under the Fourth Amendment if supported by reasonable suspicion.").

---

4 See Terry v. Ohio, 392 U.S. 1 (1968).

¶20 A seizure prompted by a suspected traffic violation can become unreasonable if the detention is "prolonged beyond the time reasonably required to complete" the mission of the traffic stop. Illinois v. Caballes, 543 U.S. 405, 407 (2005). During a traffic stop, an officer may verify a motorist's license, check vehicle registration, and issue a ticket or warning. Cervantes-Arredondo, 17 P.3d at 147. "An officer may also run a computer check for outstanding warrants so long as this procedure does not unreasonably extend the duration of the temporary detention." People v. Rodriguez, 945 P.2d 1351, 1360 (Colo. 1997) (citing People v. Cobb, 690 P.2d 848, 852 (Colo. 1984)). Authority to detain the driver "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 135 S. Ct. at 1614.

¶21 If, while completing the normal tasks incident to a traffic stop, an officer discovers information giving rise to a new reasonable suspicion, the encounter may lawfully be extended to permit further investigation. See, e.g., Rodriguez, 945 P.2d at 1361 (concluding stop for weaving was lawfully extended when registration card errors gave rise to reasonable suspicion that vehicle was stolen). In addition, "[a] longer detention or a search is permissible if the individual's consent has been obtained." People v. Hazelhurst, 662 P.2d 1081, 1086 (Colo. 1983).

¶22 We consider four factors in assessing the reasonableness of an investigatory stop: (1) the length of the detention; (2) whether the officer diligently pursued the basis for the initial stop; (3) whether the suspect was required to move from one location to another; and (4) whether there were alternative, less intrusive means available. Rodriguez, 945 P.2d at 1362; see also id. at 1363 (holding that what began as lawful

9

highway traffic stop escalated to illegal arrest when officer detained defendant for ninety minutes and, instead of using nearby exit to investigate suspicion that van was stolen, forced defendant to drive to police station).

¶23    Our consideration of an investigatory seizure's reasonableness is not confined to these factors, however. See id. at 1362 (noting courts must consider "at least" these four circumstances). For instance, we also consider the degree of force the police use. See People v. King, 16 P.3d 807, 817 (Colo. 2001) (holding seizure was arrest, not investigatory stop, when police pulled over vehicle, ordered defendants out at gun-point, told them to lie on ground, and handcuffed them).

¶24    With this framework in mind, we now apply the reasonableness standard to the facts of this stop.

### 3. Application

¶25    The trial court concluded that the investigatory seizure at issue here was unreasonable because the purpose of the stop shifted "[a]lmost immediately" from a traffic investigation to a search of the truck. The court also detected a lack of diligence on the part of Deputy Ponce and the other officers in investigating the traffic offense and concluded there were alternative, less intrusive means to more expeditiously investigate the weaving violation. Deputy Ponce, for instance, did not contact dispatch to call in Chavez-Barragan's license and registration until after the search. The trial court also noted Chavez-Barragan was required to move from his truck to the front seat of Deputy Ponce's patrol car. It concluded the detention lasted "far in excess of what was reasonably required to investigate a traffic offense," and it found that no

10

information uncovered between the initial contact and the discovery of the drugs gave rise to a reasonable suspicion that would justify extending the encounter.

¶26     For several reasons, we are not persuaded that the detention here was unreasonable.  First, a shift in investigatory purpose is not improper when the underlying detention remains lawful.  See Muehler v. Mena, 544 U.S. 93, 100–01 (2005) (holding no independent suspicion was required for officials to ask a woman about her immigration status when she was already lawfully detained in a house being searched for guns and gang evidence); see also Arizona v. Johnson, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." (emphasis added)).  While the Supreme Court has not squarely addressed whether an officer impermissibly expands the parameters of an investigatory seizure by posing questions that are unrelated to a stop's initial purpose, we are guided by the Court's statement that off-topic questioning is permissible as long as it does not "measurably extend" the stop. Johnson, 555 U.S. at 333.  Here, Deputy Ponce's brief off-topic questions did not transform the traffic stop into a seizure of unreasonable duration.  Indeed, the overwhelming weight of authority is against a bright-line rule deeming every seizure unreasonable when questions unrelated to the stop's initial purpose extend a detention for any amount of time.  See United States v. Everett, 601 F.3d 484, 492 (6th Cir. 2010) (noting "vast weight of authority is against a bright-line rule"); see also id. at 491–92 (quoting Webster's Third New International Dictionary Unabridged (1981))

11

(interpreting "measurable" to mean "'significant' or 'great enough to be worth consideration'"); United States v. Valenzuela, 494 F.3d 886, 888 (10th Cir. 2007) (explaining that traffic seizure does not become unreasonable "merely because the officer asks questions unrelated to the initial purpose for the stop, provided those questions do not unreasonably extend the amount of time the subject is delayed").

¶27 Second, a rule intolerant of even de minimis extensions would provide scant protection. An officer wanting to inquire about matters not encompassed in the detention's purpose could easily circumvent such a rule by posing questions during a period of independent delay, such as while waiting for a response from dispatch or "simply by learning to write and ask questions at the same time." Everett, 601 F.3d at 492. Moreover, such a rule would fixate on the sequence of events, micromanaging officers' decisions during traffic stops, which "[r]egrettably . . . may be dangerous encounters." Maryland v. Wilson, 519 U.S. 408, 413 (1997). This is inconsistent with the general approach of deciding Fourth Amendment issues under the rubric of reasonableness.

¶28 Third, the record shows that Deputy Ponce proceeded with reasonable diligence. She explained the reason for the stop and asked for consent within the first three minutes of the encounter. Once Chavez-Barragan orally consented to a search, Deputy Ponce was authorized to proceed within the scope of that consent. She moved quickly to memorialize the consent while being attentive to Chavez-Barragan's need for a Spanish-language form, and she carefully explained how he could revoke his consent

12

and terminate the search. We perceive no constitutional violation in Deputy Ponce's failure to multitask by calling in Chavez-Barragan's information during the search.

¶29 Fourth, Chavez-Barragan's move to the patrol car did not render this stop unreasonable. As an initial matter, Deputy Ponce acted within her authority in directing Chavez-Barragan out of his truck. See Pennsylvania v. Mimms, 434 U.S. 106, 111 & n.6 (1977) (per curiam) (holding that when police have lawfully stopped vehicle for traffic violation officer may order driver to exit vehicle); see also People v. Carlson, 677 P.2d 310, 312 (Colo. 1984) ("We conclude that a police officer in the course of a valid traffic stop may order the driver to get out of the car and walk to the rear of the vehicle without violating the federal or state proscription against unconstitutional searches and seizures."). And, accepting the trial court's finding that Chavez-Barragan "was required" to sit in the front of the patrol car, the record demonstrates that the purpose of the move was to complete the consent form, which Chavez-Barragan was informed he was free not to sign. As long as he was willing to complete the form, it made sense that Deputy Ponce would have him fill it out inside the patrol car instead of on the side of the interstate in the pre-dawn hours of a cold October morning.

¶30 Finally, the overall length of this detention was not inherently unreasonable. Deputy Ponce obtained consent early in the encounter—the trial court found Chavez-Barragan gave oral consent in the first three minutes of the stop and written consent within thirteen minutes. She did not seek consent after stalling or wearing him down through a prolonged detention. After Chavez-Barragan gave consent, officers spent about an hour searching the truck. This is a significant block of time but not

13

unreasonable if he voluntarily consented. Therefore, because we agree with the trial court that no independent suspicion justified extending this stop, the legality of the continued detention and ensuing search depends on the voluntariness of Chavez-Barragan's consent. We turn to that issue now.

## B. Validity of Consent to Search

¶31 The trial court offered two rationales for concluding Chavez-Barragan's consent was involuntary. First, it reasoned that Chavez-Barragan could not voluntarily consent to a search because he was seized for a traffic offense when he consented. Second, the trial court concluded Chavez-Barragan's consent was involuntary because coercive police conduct overbore his will.

¶32 We begin by addressing our standard of review and the law of consent searches. We reaffirm that it is possible for motorists to provide valid consent during a traffic stop because voluntariness is assessed under the totality of the circumstances and being seized is just one consideration. Considering all of the circumstances of this case, we conclude Chavez-Barragan's consent was voluntary.

## 1. Standard of Review—Voluntariness

¶33 The parties articulate somewhat inconsistent frameworks for our review, at times suggesting we must defer to the trial court's voluntariness determination and at times saying we should decide the issue ourselves. The confusion is understandable as we have sometimes treated the question of whether a defendant's consent to a search was voluntary as "a question of fact to be decided by the trial court and upheld on appeal unless clearly erroneous." People v. Drake, 785 P.2d 1257, 1266 (Colo. 1990); see also,

14

e.g., <u>People v. Reddersen</u>, 992 P.2d 1176, 1182 (Colo. 2000); <u>People v. Magallanes-Aragon</u>, 948 P.2d 528, 533 (Colo. 1997); <u>Carlson</u>, 677 P.2d at 318 ("[T]he issue of consent is essentially a factual question."); <u>Capps v. People</u>, 426 P.2d 189, 191 (Colo. 1967) (explaining trial judge is in best position to weigh facts and determine if defendant voluntarily consented to search).

¶34 But in our more recent suppression cases, we have spoken of a two-pronged standard of review traceable to <u>People v. Matheny</u>, 46 P.3d 453 (Colo. 2002). There, we asked whether the determination that a defendant was in custody was "primarily factual or primarily legal in nature." <u>Id.</u> at 459. Because the custody determination involved the application of a legal standard to a set of facts, we concluded it was "a little of both." <u>Id.</u> <u>Matheny</u> therefore adopted a mixed standard of review for these mixed questions implicating constitutional rights. <u>Id.</u> at 462. Under this standard, we review the trial court's findings of historic fact deferentially, accepting them if they are supported by competent record evidence, but we review the legal effect of those facts de novo. <u>Id.</u> Put differently, while we generally accept the trial court's findings about what happened, the ultimate conclusion of constitutional law is ours to draw.

¶35 Consistent with our contemporary practice in voluntariness cases, <u>see</u> <u>Munoz-Gutierrez</u>, ¶ 14, 342 P.3d at 443, we apply this mixed standard here.

### 2. Consent Searches Generally

¶36 The federal and state constitutions prohibit unreasonable searches. <u>See</u> U.S. Const. amend. IV; Colo. Const. art. II, § 7. If a person consents to a search, that search does not violate those constitutional provisions, <u>see</u> <u>Reddersen</u>, 992 P.2d at 1181, but a

consent search is constitutionally justifiable "only if that consent is voluntarily given," People v. Licea, 918 P.2d 1109, 1112 (Colo. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 243 (1973)).[5]

¶37 "Consent is voluntary if it is 'the product of an essentially free and unconstrained choice by its maker.'" Munoz-Gutierrez, ¶ 16, 342 P.3d at 444 (quoting Schneckloth, 412 U.S. at 225). Voluntary consent cannot be "the result of circumstances which overbear the consenting party's will and critically impair his or her capacity for self-determination." Magallanes-Aragon, 948 P.2d at 530. A "consensual search is involuntary if it is 'the result of duress or coercion, express or implied, or any other form of undue influence exercised [by the police] against the defendant.'" Munoz-Gutierrez, ¶ 17, 342 P.3d at 444 (alteration in original) (quoting Magallanes-Aragon, 948 P.2d at 531). "Undue influence includes promises, threats, and intrusive or threatening police conduct." Id.

¶38 Voluntariness is assessed through consideration of the totality of the circumstances. See id. at ¶ 18, 342 P.3d at 444; Licea, 918 P.2d at 1112 (citing Schneckloth, 412 U.S. at 227). We thus consider "the environment in which the defendant gives consent," and we assess how the police acted during the encounter. Magallanes-Aragon, 948 P.2d at 531. We also consider "the defendant's perceptions" and characteristics "such as age, education, and knowledge." Id. Language barriers are

---

[5] The parties agree that the prosecution must prove the voluntariness of a defendant's consent by clear and convincing evidence. Because we conclude the People have carried that burden, we have no cause to address whether a showing of voluntariness by a preponderance of the evidence would suffice.

also relevant along with "anything else that could have affected the defendant's free and unconstrained choice in consenting to the search." See Munoz-Gutierrez, ¶¶ 20–21, 342 P.3d at 444–45 (citing People v. Helm, 633 P.2d 1071, 1077 (Colo. 1981)). This includes whether a defendant knew he had a choice, but consent can be voluntary even if a defendant did not know he was free to withhold his consent. See Schneckloth, 412 U.S. at 227; Munoz-Gutierrez, ¶ 20, 342 P.3d at 444 ("[V]oluntary consent need not be given with knowledge of the right to refuse . . . ."); see also Magallanes-Aragon, 948 P.2d at 532. Colorado provides by statute that peace officers must explain to suspects that they have the right to refuse, see § 16-3-310(1)(b)(II), C.R.S. (2016), but an officer's failure to give this advisement is only a factor in determining the voluntariness of consent, see § 16-3-310(3), C.R.S. (2016); see also Munoz-Gutierrez, ¶¶ 26–27, 342 P.3d at 446.

¶39    In the end, "[i]t is the relationship between the police conduct and a person in the defendant's circumstances, and with the defendant's particular characteristics, which is critical to this determination" of voluntariness. Magallanes-Aragon, 948 P.2d at 531. "[T]he key concern is whether the police's intrusive conduct 'critically impaired the defendant's judgment.'" Munoz-Gutierrez, ¶ 17, 342 P.3d at 444 (quoting Magallanes-Aragon, 948 P.2d at 531). The police conduct "must not overbear the defendant's will." Id. at ¶ 23, 342 P.3d at 445 (citing Magallanes-Aragon, 948 P.2d at 530).

### 3. Consent Searches During Traffic Stops

¶40    Under its first rationale, the trial court concluded Chavez-Barragan's consent could not have been voluntary because he was seized for a traffic violation at the time

he gave consent. We reject this conclusion because a person who is seized is capable of voluntarily consenting to a search.

¶41     Traffic stops can morph into consensual encounters once tasks associated with them are complete, but the shift may be so "seamless" that "[m]ost citizens would not recognize the transition." Cervantes-Arredondo, 17 P.3d at 147. To demarcate the legally distinct phases of what is usually a single interaction, we have held that, as long as an officer retains a driver's documentation (license, registration, etc.), the driver is not free to leave and thus the encounter cannot be consensual. Id. at 148. Only after the officer returns the driver's documentation is it possible for a consensual encounter to begin. Id.; see also People v. Castañeda, 187 P.3d 107, 109 (Colo. 2008).

¶42     Looking to this rule, the trial court concluded that, because Deputy Ponce took possession of Chavez-Barragan's documents early in the encounter and retained them until the search was over, Chavez-Barragan was seized at the time he consented to the search. With this much we agree. But the trial court went on to conclude that "[b]ecause a consensual encounter could not have begun it necessarily follows that voluntary consent to search could not have been obtained." This was error.

¶43     "[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." United States v. Watson, 423 U.S. 411, 424 (1976); accord Helm, 633 P.2d at 1077 ("Custody alone does not render consent involuntary."). Indeed, the Supreme Court's seminal consent-search decision, Schneckloth, was itself a traffic-stop case. 412 U.S. at 220 (describing car search following stop for burned-out headlight). It follows that a person seized during an

18

investigatory traffic stop, a lesser form of intrusion, can voluntarily consent to a search as well.

¶44 Our precedent confirms the point, too. For example, in People v. Castro, a driver stopped for speeding gave voluntary consent to a car search that turned up cocaine. 159 P.3d 597, 598, 601 (Colo. 2007). In Reddersen, the defendant was stopped for having expired plates, and, five minutes into the encounter, while the officer waited on dispatch, the defendant voluntarily consented to a search that uncovered drugs on his person. 992 P.2d at 1179, 1181–82.

¶45 We therefore reject the conclusion that Chavez-Barragan's consent could not have been voluntary because of the ongoing traffic seizure. We now consider whether Chavez-Barragan's consent to this search was voluntary based on the totality of the circumstances.

### 4. Chavez-Barragan's Consent Was Voluntary

¶46 Having reviewed the record, and deferring to the trial court's determinations concerning the facts of the encounter, we conclude that under the totality of the circumstances Chavez-Barragan's consent was voluntary.

¶47 This stop occurred early in the morning along a stretch of rural interstate. The video shows traffic still passing by regularly; Chavez-Barragan was not alone in an isolated area with the police. When Chavez-Barragan was asked to consent to a search, there were "[a] number" of police on the scene, but they were not in close proximity to him and he principally interacted with Deputy Ponce.

19

¶48 Limited evidence was presented concerning Chavez-Barragan's age, but the video makes plain that he is an adult. The trial court made no findings as to his education and intelligence, but it found he was a self-employed truck driver with no prior experience with law enforcement or the criminal justice system. Chavez-Barragan was able to read Spanish, and—though not fluent in English—he was able to speak conversationally and respond appropriately in English to questions from English-speaking officers. He was respectful and cooperative throughout the encounter, as was Deputy Ponce, whose tone of voice in the recording was polite and even friendly. The trial court made no finding that she acted threateningly when speaking with Chavez-Barragan outside the patrol car.

¶49 The trial court did, however, identify four instances of coercive police conduct: first, Deputy Ponce patted down Chavez-Barragan without any reasonable suspicion that he was armed or dangerous; second, she requested consent to search the truck before the ordinary incidents of her traffic investigation had concluded; third, she took possession of Chavez-Barragan's driving documents early in the encounter and did not return them until after the search; and finally, she directed Chavez-Barragan to sit in the patrol car and remain there with Deputy Campbell during the search.

¶50 None of these incidents, alone or in concert, was sufficiently coercive to overbear the defendant's will or critically impair his judgment.

¶51 First, irrespective of whether Deputy Ponce could have ordered a pat-down, the trial court found that she asked Chavez-Barragan if she could pat him down and that he

20

"agreed to submit" to the pat-down search. The trial court did not find the pat-down was conducted in a coercive manner, nor does the video suggest as much.

¶52 Second, the fact that Deputy Ponce requested consent during the first three minutes of the encounter and before completing the tasks associated with the traffic-stop does not make the request coercive. The trial court made no findings that the manner in which Deputy Ponce requested consent was threatening or overbearing.

¶53 Third, Deputy Ponce's retention of Chavez-Barragan's documentation demonstrates only that he continued to be seized. It does not show that her request was coercive or that his consent was involuntary. Even though Chavez-Barragan was not yet free to go, Deputy Ponce informed him that he was being asked to voluntarily consent to a search, and the Spanish-language consent form Chavez-Barragan signed informed him he could refuse to allow the search. Based on these facts, the trial court concluded Deputy Ponce complied with section 16-3-310(1), C.R.S. (2016).[6]

¶54 Finally, Chavez-Barragan's move to the patrol car was not coercive either. Even assuming Deputy Ponce required him to sit in the vehicle, Chavez-Barragan had already orally consented to the search. Thus, the police-car setting was not used as an intimidation tactic to elicit his consent. Moreover, the recording from inside the patrol car shows the mood remained cordial. As the search progressed, Chavez-Barragan engaged in polite conversation with Deputy Campbell, who was prepared to call off the search if Chavez-Barragan chose to revoke his consent. He never did. In fact, Chavez-

---

[6] Section 16-3-310(1) requires a peace officer, prior to conducting a consensual search of an individual's vehicle, to inform the individual that he is being asked to voluntarily consent to a search and that he has the right to refuse the request to search.

21

Barragan demonstrated his ongoing consent by volunteering to obtain the keys for officers to search the trailer.

¶55 Nor did the language barrier prevent Chavez-Barragan from voluntarily consenting. Chavez-Barragan spoke English well enough to reliably communicate with Deputy Ponce. See Castro, 159 P.3d at 600 (concluding language barrier was not determinative and consent to search car was voluntary when defendant spoke English well enough to appropriately respond to officers' questions). There is no evidence that Deputy Ponce leveraged the language barrier to obtain Chavez-Barragan's consent. Rather, she sought to make sure he understood the search she was requesting by providing him a written explanation in Spanish. Cf. Munoz-Gutierrez, ¶¶ 33–35, 342 P.3d at 448 (concluding language barrier not determinative when defendant understood consent request through translator).

¶56 We thus reject the trial court's conclusion that there was coercive police conduct sufficient to "overbear" Chavez-Barragan's will, id. at ¶ 23, 342 P.3d at 445, or "critically impair" his judgment, Magallanes-Aragon, 948 P.2d at 531. Considering the totality of the circumstances, we conclude the People carried their burden of showing that Chavez-Barragan voluntarily consented to this search.

## C. Suppression of Statements

¶57 The trial court suppressed Chavez-Barragan's incriminating statements because it found they were tainted by the prior illegal search of the truck. See Perez v. People, 231 P.3d 957, 964 (Colo. 2010) (discussing fruit-of-the-poisonous-tree doctrine and suppression of statements made after illegal search); see also Brown v. Illinois, 422 U.S.

590, 601–02 (1975). Because we conclude the traffic stop was reasonable as the search was authorized by Chavez-Barragan's voluntary consent, no prior illegality tainted his statements. We therefore reverse the trial court's order suppressing them.

### III. Conclusion

¶58 We conclude on the facts presented here that the investigatory detention following the traffic stop was reasonable and that Chavez-Barragan's consent to the search was voluntary. Thus, the drugs found in the truck should not have been suppressed. And because no illegal police conduct preceded Chavez-Barragan's statements, the trial court erred in suppressing them as fruit of the poisonous tree. Accordingly, the order suppressing the drugs and Chavez-Barragan's statements is reversed.