22CA0668 Peo v Suazo 09-05-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0668
Mesa County District Court No. 20CR1466
Honorable Matthew D. Barrett, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Chastity Renea Suazo,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE MOULTRIE
Dunn and Bernard*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 05, 2024

Philip J. Weiser, Attorney General, Grant R. Fevurly, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John Plimpton, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Defendant, Chastity Renea Suazo, appeals the judgment of conviction entered on a jury verdict finding her guilty of possession with intent to distribute methamphetamine, conspiracy to distribute methamphetamine, and possession of drug paraphernalia.  We affirm.

## I.     Background

¶ 2     In 2020, the Western Colorado Drug Task Force (Task Force) began investigating Suazo and others for their involvement in a conspiracy to possess and distribute methamphetamine.  In September 2020, Detective Chad Simpson applied for a search warrant that authorized him to affix a GPS device to Suazo's vehicle after another officer witnessed Suazo involved in a possible hand-to-hand drug sale.

¶ 3     A month later, Detective Simpson and other Task Force officers surveilling Suazo observed her with Bruce Seagrave, who was also under investigation for involvement in the drug conspiracy.  Officers saw Suazo and Seagrave seated in different cars parked in front of a storage facility unit.  When Suazo drove away from the storage facility, Detective Simpson — who was aware Suazo had an active warrant for driving on a suspended license —

notified Seargent Shaver Hansen, a Mesa County sheriff's deputy, who in turn initiated a traffic stop of Suazo.

¶ 4    Suazo pulled into the driveway of a residence. Once Suazo's car came to a stop, she "quickly exited the vehicle" and locked the keys inside of it. While running Suazo's driver's license, Sergeant Hansen observed "a [s]harp[]s container" in the car's back passenger seat, which he presumed contained used hypodermic needles. Suazo continued to place and take phone calls despite Sergeant Hansen asking her to stop. Suazo's husband, Earnest Vega, arrived at the location of the traffic stop shortly thereafter and offered to "take the car immediately."

¶ 5    Sergeant Hansen requested the assistance of a drug-detection dog to conduct a drug sniff of the vehicle, and Officer Joey Gonzalez and his K-9, Merlin, arrived on the scene. After Merlin positively alerted on the front passenger side door, the officers searched Suazo's car and found the following items: a sharps container with used hypodermic needles, a used hypodermic needle inside of a purse, a set of brass knuckles, approximately a half of a pound of methamphetamine inside of the pocket of a winter coat, $864.01 in cash, and three cell phones. Suazo was arrested on multiple

charges, including driving under restraint and possession of drug paraphernalia.

¶ 6    In the days following Suazo's arrest, officers searched Suazo's storage unit and residence.  In Suazo's storage unit, officers found "a pay owe sheet . . . with various names and quantities next to the names," hypodermic syringes, and a used pipe commonly used to smoke methamphetamine.  In Suazo's home, officers found a pencil case with individual small bags, needles, a digital scale with suspected methamphetamine residue, Suazo's photo ID and mail, bigger plastic bags, and a safe.

¶ 7    The prosecution charged Suazo with possession with intent to manufacture or distribute more than 112 grams of methamphetamine, possession of an illegal weapon, driving under restraint, possession of drug paraphernalia, and conspiracy to distribute more than 225 grams of methamphetamine.  The jury found Suazo guilty of possession with intent to sell or distribute more than 112 grams of methamphetamine, possession of drug paraphernalia, and conspiracy to sell or distribute more than 225 grams of methamphetamine.  The jury acquitted Suazo of the remaining charges.

¶ 8    The district court imposed a $100 fine for the possession of drug paraphernalia charge and sentenced Suazo to concurrent sentences of twenty-four years in the custody of the Department of Corrections for the possession with intent to distribute and the conspiracy to sell or distribute charges.

¶ 9    Suazo appeals her convictions asserting that (1) the district court erred by denying her motions to suppress the evidence seized from her car during the traffic stop; (2) the district court erred by permitting Detective Simpson to testify about the search warrant to affix the GPS tracking device to her vehicle; (3) her convictions for possession with intent to distribute and conspiracy to distribute violate double jeopardy; (4) the district court erred by considering her lack of remorse at sentencing; and (5) the alleged errors are cumulative.  We address each contention in turn.

## II.    Denial of Motions to Suppress

¶ 10    Suazo argues that the district court erred by denying her pretrial motions to suppress because (1) law enforcement lacked justification to extend the traffic stop, and (2) the drug-detection dog's alert was unreliable.

4

## A.    Additional Relevant Facts

¶ 11    Suazo filed two pretrial motions to suppress seeking to exclude evidence obtained from the search of her vehicle.  The district court denied Suazo's motions following an evidentiary hearing.

¶ 12    Relying on Suazo's active warrant for her arrest, the court concluded, "[T]here's no dispute that there was reasonable suspicion, if not probable cause, to effectuate the stop of [the] vehicle."  The court also concluded that the traffic stop was not unlawfully extended because Seargent Hansen had an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring based on (1) Suazo's decision to pull into a private driveway and immediately exit her vehicle and lock the keys in the car; (2) Seargent Hansen's observation that Suazo's vehicle contained a "sharps" container and used and unused hypodermic needles; (3) Seargent Hansen's knowledge that the Task Force wanted to contact Suazo for investigation; and (4) Suazo's agitated behavior, which included placing phone calls to Vega to come get the car.

¶ 13    The court also found that about twenty-four minutes passed between the traffic stop and the time Suazo was arrested on her

active warrant. From there, another fifteen minutes passed before the drug-detection dog arrived — resulting in Suazo being detained for a total of thirty-eight minutes, which the court found was not unreasonable. Finally, relying on the drug-detection dog's training and certifications, as well as Officer Gonzalez's credible testimony, the court concluded that the dog's alert was reliable.

## B.     Standard of Review

¶ 14     Our review of court's ruling on a motion to suppress involves a mixed question of fact and law. *People v. Moreno*, 2022 CO 19, ¶ 12. We defer to the district court's factual findings as long as they're supported by sufficient competent evidence in the record. *Id.* We review de novo the district court's legal conclusions. *People v. Cline*, 2019 CO 33, ¶ 13.

## C.     Justification to Extend Traffic Stop

¶ 15     Suazo first challenges the district court's ruling as to Seargent Hansen's justification to extend the traffic stop. We discern no error.

### 1.     Applicable Law

¶ 16     The State and Federal Constitutions protect individuals from unreasonable governmental searches and seizures. U.S. Const.

6

amend. IV; Colo. Const. art. II, § 7. A warrantless search is presumptively unreasonable and thus unconstitutional unless an exception to the warrant requirement exists. *People v. McKnight*, 2019 CO 36, ¶ 23. One exception to the warrant requirement is an investigatory stop. *People v. Funez-Paiagua*, 2012 CO 37, ¶ 7; *see also People v. Gamboa-Jimenez*, 2022 COA 10, ¶ 36 (investigatory stops typically include traffic stops).

¶ 17  Investigatory stops must be justified by an officer's "reasonable articulable suspicion to believe that the detainee is committing, has committed, or is about to commit a crime" and, further, are "limited in scope to a brief detention to confirm or dispel that suspicion." *People v. Fields*, 2018 CO 2, ¶ 12.

¶ 18  Seizures resulting from a suspected traffic violation can become unreasonable if they are "'prolonged beyond the time reasonably required to complete' the mission of the traffic stop." *People v. Chavez-Barragan*, 2016 CO 66, ¶ 20 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). However, if an officer "discovers information giving rise to a new reasonable suspicion, the encounter may lawfully be extended to permit further investigation." *Id.* at ¶ 21. To determine whether a traffic stop was

unreasonably extended, "we must 'consider[] the facts and circumstances that gave rise to the initial stop plus any additional information learned by the officer before issuing a warning or citation.'" *Gamboa-Jimenez,* ¶ 39 (quoting *People v. Cervantes-Arredondo,* 17 P.3d 141, 148 (Colo. 2001)).

### 2. Analysis

¶ 19    Suazo concedes Seargent Hansen had reasonable suspicion to conduct an investigatory stop due to her invalid driver's license and the active warrant for her arrest. *See id.* at ¶ 37 ("[A]n officer only needs to have reasonable suspicion that a driver has committed a traffic violation to pull the driver over."). However, Suazo contends the officer impermissibly extended the stop for the drug-detection dog, Merlin, to arrive.

¶ 20    But Sergeant Hansen had more than reasonable suspicion when he initiated the traffic stop — he had probable cause to arrest Suazo based upon her outstanding warrant. *See People v. Gouker,* 665 P.2d 113, 116 (Colo. 1983) (an outstanding warrant is prima facie evidence of probable cause); *see also Fields,* ¶ 12 ("[I]f probable cause for an arrest has been acquired, the detention no longer need be justified as an investigatory stop but is rather justified as an

8

arrest."). Seargent Hansen testified that he decided to arrest Suazo and then request the K-9 unit based on her outstanding warrant, his observation of drug paraphernalia in Suazo's car, and her erratic behavior during the traffic stop. Though she was initially stopped because of the active traffic warrant, "a shift in investigatory purpose is not improper when the underlying detention remains lawful." *Chavez-Barragan*, ¶ 26; *see also People v. Johnson*, 2024 CO 47, ¶ 43 (concluding drug-detection dog's sniff and search of defendant's vehicle need not be examined as an extension of an investigatory stop because officer had probable cause to arrest defendant).

¶ 21    Thus, because Seargent Hansen had probable cause to arrest Suazo when he initiated the traffic stop, we need not examine whether the stop was unreasonably extended. *See Fields*, ¶ 12.

### D.    Reliability of the Drug-Detection Dog

¶ 22    Second, Suazo challenges the district court's ruling as to the reliability of the drug-detection dog in creating probable cause for a search. Again, we discern no error.

### 1. Applicable Law

¶ 23 An officer may conduct a search of a car without first obtaining a warrant if the officer has lawfully stopped a vehicle and has probable cause to believe the vehicle contains evidence of a crime. *McKnight*, ¶ 24. A police officer has probable cause to conduct a search when there are facts available to the officer that would cause a reasonably cautious person to believe that contraband or evidence of a crime is present. *People v. Zuniga*, 2016 CO 52, ¶ 16. In analyzing probable cause, we consider the totality of the circumstances. *People v. Smith*, 2022 CO 38, ¶ 29. And, in instances where a satisfactorily trained drug-detection dog is involved, the dog's alert alone may be sufficient to support probable cause. *Florida v. Harris*, 568 U.S. 237, 246-47 (2013); *Gamboa-Jimenez*, ¶ 59.

### 2. Analysis

¶ 24 Officer Gonzalez testified that he and Merlin had been through extensive training together, that Merlin was certified through the Colorado Police Canine Association and the National Police Canine Association, that they both maintain ongoing certification, and that they were both certified in October 2020. He also testified that he

had been in the K-9 unit for approximately three years, that he had been Merlin's only handler during that time, and that he was familiar with the changes in Merlin's body language and breathing patterns that signal the potential presence of illegal substances. Officer Gonzalez further testified that at the time of the stop, Merlin was trained to detect cocaine, methamphetamine, and heroin and that Merlin alerted positively at the exterior passenger side door handle of Suazo's car.

¶ 25 The district court found there was probable cause to search Suazo's car for narcotics because Merlin was a reliable, properly trained, and certified drug-detection dog. And because the district court's findings are supported by the record, we won't disturb them.

### III. Testimony Regarding Search Warrant

¶ 26 Suazo next asserts the district court erred when it permitted Detective Simpson to testify that he applied for and received a search warrant to attach a GPS tracking device to Suazo's vehicle in the weeks before the traffic stop because whether the Task Force had probable cause to surveil Suazo was not at issue. We aren't persuaded.

11

## A. Additional Relevant Facts

¶ 27    Suazo objected to Detective Simpon's testimony that he had "applied for a search warrant which would authorize [him] to place a GPS device on . . . Suazo's vehicle," arguing that it was "judicial bolstering." The district court overruled Suazo's objection, but later indicated that Suazo could supplement her objection with case law, and if appropriate, the court would provide a limiting instruction to the jury.

¶ 28    The next day, Suazo supplemented her objection by citing *People v. Mullins*, 104 P.3d 299 (Colo. App. 2004). The district court reviewed *Mullins* and again overruled the objection — noting that *Mullins* was distinguishable — but indicated it would provide a curative jury instruction if Suazo desired. Suazo declined to have the court provide a curative instruction to the jury.

## B. Standard of Review

¶ 29    We review a district court's evidentiary rulings for an abuse of discretion. *Gonzales v. People*, 2020 CO 71, ¶ 25. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or based on an erroneous understanding of the law. *Yusem v. People*, 210 P.3d 458, 463 (Colo. 2009).

¶ 30 Because Suazo preserved this issue, we review for nonconstitutional harmless error and reverse only for errors that substantially influenced the verdict or affected the fairness of the trial. *See People v. Martinez*, 2020 COA 141, ¶¶ 26-28.

### C. Applicable Law and Analysis

¶ 31 "[W]here probable cause to arrest or search is not at issue, it is improper to present to the jury evidence about obtaining an arrest or search warrant." *Mullins*, 104 P.3d at 301. However, under some circumstances, police officers may testify about why they took certain investigative steps, even when "this testimony touches upon prohibited subjects." *People v. Penn*, 2016 CO 32, ¶ 32.

¶ 32 As the district court found, Detective Simpson wasn't testifying about the process of obtaining a search warrant or the standard for probable cause. *See Mullins*, 104 P.3d at 300. Instead, his testimony was offered to provide context about the Task Force's investigation of Suazo and the chain of events preceding the traffic stop. *See Penn*, ¶ 33. And because Detective Simpson's testimony was brief and didn't suggest that Suazo had committed a particular offense or that the court believed the same, the concern addressed

by the supreme court in *Mullins* was not present here. *See Mullins*, 104 P.3d at 302.

¶ 33     Further, even if admission of this testimony was erroneous, we aren't persuaded that it substantially influenced the verdict or affected the fairness of the trial. The statement was isolated, the prosecution didn't mention the statement in closing argument or otherwise reference it again, and Suazo declined the court's proffered limiting jury instruction. And the evidence of Suazo's guilt was overwhelming. In addition to the nearly half a pound of methamphetamine found in her car following her arrest, officers found paraphernalia and evidence of distribution in Suazo's car, home, and storage unit, and multiple witness testified they had observed Suazo in possession of large amounts of methamphetamine or that Suazo had sold them methamphetamine.

¶ 34     Accordingly, any error in permitting Detective Simpson's testimony that he applied for a warrant was harmless.

IV.   Double Jeopardy

¶ 35     Suazo also argues her convictions for possession with intent to distribute methamphetamine and conspiracy to distribute methamphetamine violate double jeopardy. We disagree.

14

## A. Standard of Review

¶ 36 We review de novo a claim that a defendant's conviction violates her constitutional protection against double jeopardy. *People v. Arzabala*, 2012 COA 99, ¶ 19.

¶ 37 Suazo did not preserve this issue. However, when a defendant establishes a district court violated double jeopardy principles, an appellate court is required to remedy the error by merging the convictions. *Whiteaker v. People*, 2024 CO 25, ¶¶ 23-28; *see also People v. Lowe*, 2020 COA 116, ¶ 38 ("[W]hen a defendant's double jeopardy rights have been violated, [she] is entitled to the appropriate relief on appeal.").

## B. Applicable Law

¶ 38 The double jeopardy clause protects criminal defendants from multiplicity, *Arzabala*, ¶ 20, which occurs "when the same offense is charged in multiple counts and results in multiple punishments," *People v. Borghesi*, 66 P.3d 93, 98 (Colo. 2003). However, the prosecution may "pursue multiple convictions if the underlying evidence supports factually distinct offenses." *Woellhaf v. People*, 105 P.3d 209, 218 (Colo. 2005).

¶ 39     To determine whether a defendant is prosecuted for multiple

charges under the same criminal statute, we apply a two-pronged

test. *People v. Manzanares*, 2020 COA 140M, ¶ 41. First, we

identify the legislatively prescribed unit of prosecution. *Woellhaf*,

105 P.3d at 215. Second, we determine if the defendant's conduct

constitutes factually distinct offenses by examining the "factual

components of each prosecution and the evidence in support

thereof." *Id.* (quoting *People v. Williams*, 651 P.2d 899, 902-03

(Colo. 1982)). "If the convictions are not based on separate

offenses, they merge with one another." *Arzabala*, ¶ 22.

¶ 40     Section 18-18-405(1)(a), C.R.S. 2024, states,

> [I]t is unlawful for any person knowingly to
> manufacture, dispense, sell, or distribute, or to
> possess with intent to manufacture, dispense,
> sell, or distribute, a controlled substance; . . .
> or conspire with one or more other persons, to
> manufacture, dispense, sell, distribute, or
> possess with intent to manufacture, dispense,
> sell, or distribute, a controlled substance . . . .

¶ 41     The supreme court examined section 18-18-405 and

concluded that the "acts enumerated in [sub]section 405(1)(a) all

represent stages in the commission of one crime." *People v.*

*Abiodun*, 111 P.3d 462, 468 (Colo. 2005). However, "[t]he various

enumerated acts are related, or fall along the same continuum . . . only to the extent that they potentially involve the distribution of the same quantum of contraband." *Id.* at 470. Thus, "[a]s long as each legally distinct offense has been charged with sufficient specificity to distinguish it from other offenses, and the evidence at trial is sufficient to support convictions of each charge, general verdicts of guilt will be adequate to support multiple convictions." *Id.* at 471 (citation omitted).

¶ 42 Whether the prosecution presented evidence of factually distinct conduct to support two separate convictions "hinges on whether the prosecution provided sufficient evidence to show the existence of more than one quantum of drugs." *People v. Davis*, 2015 CO 36M, ¶ 36. The convictions must merge if both "charges arise out of actions involving a single 'discrete quantum of drugs.'" *Id.* at ¶ 35 (citation omitted).

### C.    Analysis

¶ 43 Suazo's convictions for possession with intent to sell or distribute methamphetamine and conspiracy to sell or distribute were based on factually distinct conduct. The prosecution presented evidence linking the specific quantities of drugs to the

17

respective charges during trial — namely, the possession charge was based on the 202.88 grams of methamphetamine found in Suazo's car, and the conspiracy charge was based on witness testimony indicating Suazo was observed on multiple occasions with up to a pound of methamphetamine that she gave to others to sell. The prosecution also presented evidence that the respective charges were based on different events separated by space and time — specifically, methamphetamine found in Suazo's car during the October 2020 traffic stop and quantities of up to one pound sold and delivered to individuals for resale from August through December 2020. *See Abiodun*, 111 P.3d at 471 (noting factors like "proximity in space and time, intervening events, and volitional departures" assist in assessing whether transactions are sufficiently distinct); *see also People v. Flowers*, 128 P.3d 285, 290-91 (Colo. App. 2005) (concluding that the defendant's convictions for possession of cocaine and distribution of cocaine were based on factually distinct conduct when counsel argued that the charges were based on different quantities of drugs involved in different events). Therefore, the prosecution presented evidence

demonstrating that the charges were based on factually distinct conduct.

¶ 44     Accordingly, because the evidence was sufficient to support the separate offenses of possession with intent to sell or distribute and conspiracy to sell or distribute, we conclude Suazo's convictions do not violate double jeopardy.

## V.     Considerations During Sentencing

¶ 45     Suazo next argues that the district court erred when it considered her lack of expression of remorse during sentencing.  We discern no error.

### A.     Additional Relevant Facts

¶ 46     At Suazo's sentencing hearing, the district court informed Suazo of her right to remain silent and her right to address the court before sentencing.  Suazo affirmatively chose to exercise her right to remain silent.

¶ 47     In its sentencing order, the court noted that Suazo had three prior drug-related felony convictions (two of which were for distribution), that she had "been doing this for over 20 years," and that the evidence overwhelmingly showed Suazo was the leader of a

19

drug organization and was dealing substantial quantities of methamphetamine.

¶ 48    The court then stated the case was about the following:

> [A] dealer, plain and simple, who chose to peddle methamphetamine to those in our community who are most in danger of it and she has no remorse for it, and she did it all while on probation, having twice, three times before been convicted of controlled substance related activity.

¶ 49    The court went on to emphasize that Suazo ran an organization engaged in the distribution of pounds of methamphetamine and that she "tried to run it from the jail, too" before concluding that the circumstances were "aggravating."

¶ 50    The court considered the sentencing range of twelve to thirty-two years — with twenty-two years as the midpoint. Ultimately, the court determined that Suazo's case didn't fall on the "lesser end of the spectrum" given the allegations proved at trial and Suazo's criminal history but that the case also didn't warrant the highest end of the range given the "nature of the organization."

¶ 51    The district court sentenced Suazo to concurrent sentences of twenty-four years in the custody of the Department of Corrections for the possession and conspiracy charges. As the court was

imposing this sentence, it stopped to ask, "Is something funny, Ms. Suazo?" Suazo replied, "Absolutely. That is a whole lot of time." Suazo didn't object to the court's remarks and didn't move for reconsideration of her sentence.

## B. Standard of Review

¶ 52    We review constitutional challenges to the district court's sentencing determinations de novo. *Villanueva v. People*, 199 P.3d 1228, 1231 (Colo. 2008). Because Suazo raised an unpreserved argument premised on a constitutional violation, we review for plain error. *See Hagos v. People*, 2012 CO 63, ¶ 14.

## C. Applicable Law

¶ 53    "In exercising its sentencing discretion, a trial court must consider a number of factors, including the rehabilitative potential of the offender." *People v. Lopez*, 129 P.3d 1061, 1067 (Colo. App. 2005). "An offender's lack of remorse and failure to accept responsibility are relevant to the issue of rehabilitative potential." *Id.* But "[w]hen a defendant maintains [their] constitutional right to remain silent throughout trial and the sentencing hearing, the court cannot construe this silence to indicate a lack of remorse that will

21

support a sentence in the aggravated range." *People v. Everett*, 250 P.3d 649, 664 (Colo. App. 2010).

¶ 54 A court "may rely on any evidence in the record to justify a finding that [the] defendant lacked remorse." *Id.* Indeed, a district court's "remarks about [the] defendant's lack of remorse . . . and failure to take responsibility must be viewed in the context of its other findings." *Lopez*, 129 P.3d at 1068.

¶ 55 If a district court considers a defendant's silence in violation of their Fifth Amendment right, the error is harmless, and "the sentence imposed may be affirmed only if the record clearly supports the conclusion that the trial court would have imposed the same sentence even had it not considered the constitutionally illegitimate factor." *People v. Young*, 987 P.2d 889, 895 (Colo. App. 1999).

### D. Analysis

¶ 56 Relying on *Young*, Suazo argues that the district court reversibly erred by interpreting the exercise of her right to remain silent as a lack of remorse. We aren't persuaded.

¶ 57 In *Young*, a division of this court held that "if a defendant maintains [their] innocence and invokes [their] right against

self-incrimination both at trial and at sentencing, a trial court cannot constitutionally consider [their] lack of an expression of remorse as an aggravating circumstance." 987 P.2d at 894-95.

¶ 58 Here, the court's brief statement about Suazo's lack of remorse was made in the context of its review of Suazo's actions in the case and her prior relevant criminal history. *See Lopez*, 129 P.3d at 1068; *see also Everett*, 250 P.3d at 664. Notably, the court did not indicate it intended to punish Suazo for exercising her right to remain silent.

¶ 59 Before sentencing Suazo, the district court made detailed findings taking into consideration many factors, including Suazo's prior felony convictions, the impact of methamphetamine on the community, deterrence principles, and punishment. After considering these factors, the court imposed a sentence of twenty-four years, just over the median range of twelve to thirty-two years. The court thus imposed a sentence within the statutory range, based on appropriate considerations that are reflected in the record and factually supported by the circumstances of the case. Under these circumstances, we aren't persuaded that the district court improperly considered Suazo's exercise of her right to remain silent.

23

But, even if it did, any error was harmless. *See Young*, 987 P.2d at 895.

## VI. There is No Cumulative Error

¶ 60 Finally, Suazo argues the four errors she has asserted warrant reversal under the cumulative error doctrine. To reverse based on the cumulative error doctrine, we "must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69, ¶ 25. Here, we need not conduct a cumulative error analysis because we have concluded that the district court did not reversibly err. *See People v. Conyac*, 2014 COA 8M, ¶ 152 ("The doctrine of cumulative error requires that numerous errors be committed, not merely alleged.").

## VII. Disposition

¶ 61 We affirm the judgment of conviction.

JUDGE DUNN and JUDGE BERNARD concur.

24